UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE COTE

---------------------------------------------------------x
KINGS ROAD INVESTMENTS LTD., :
:
Plaintiff, :          Civ. Action No.:_____
:
v. :
:
THE ALLIED DEFENSE GROUP, INC., :          **COMPLAINT**
:
Defendant. :
---------------------------------------------------------x

07 CV 3262

RECEIVED
APR 23 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Kings Road Investments Ltd. ("Kings Road"), by its attorneys Schulte

Roth & Zabel LLP, as and for its Complaint against Defendant The Allied Defense Group, Inc.,

("Allied Defense" or the "Company"), hereby alleges on the basis of knowledge with respect to

itself and its actions, and on the basis of information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    This is an action for damages resulting from Allied Defense's breach of

representations, warranties and covenants relating to a Senior Subordinated Convertible Note it

issued to Kings Road on March 9, 2006 (the "Note"), including Allied Defense's refusal to

redeem the Note as it is required to do. A copy of the Note is attached hereto as Exhibit A.

## THE PARTIES

2.    Plaintiff Kings Road Investments Ltd. is a Cayman Islands exempted

company with its registered office at George Town, Grand Cayman.

3.    Defendant Allied Defense is a Delaware corporation with its principal

place of business at 8000 Towers Crescent Drive, Suite 260, Vienna, Virginia 22182.

## JURISDICTION AND VENUE

4.    Jurisdiction in this action is based upon diversity of citizenship of the

parties pursuant to 28 U.S.C. § 1332.

5.    The amount in controversy exceeds the sum of seventy-five thousand

dollars ($75,000), exclusive of interest and costs.

6.    Venue for this action is proper under 28 U.S.C. § 1391(a)(2) because a

substantial part of the events and omissions giving rise to the claim occurred in this District.

7.    The parties have agreed that this dispute may be adjudicated in this Court.

The Note that is the subject of this action provides as follows:

> The Company [Allied Defense] hereby irrevocably submits to the
> exclusive jurisdiction of the state and federal courts sitting in The
> City of New York, Borough of Manhattan, for the adjudication of
> any dispute hereunder or in connection herewith or with any
> transaction contemplated hereby or discussed herein, and hereby
> irrevocably waives, and agrees not to assert in any suit, action or
> proceeding, any claim that it is not personally subject to the
> jurisdiction of any such court, that such suit, action or proceeding
> is brought in an inconvenient forum or that the venue of such suit,
> action or proceeding is improper.

Exhibit A at § 28.

8.    Furthermore, Section 9(a) of the Securities Purchase Agreement dated as

of March 9, 2006, which was entered into between Allied Defense and Kings Road, among

others, provides, in part, as follows:

> Each party hereby irrevocably submits to the exclusive jurisdiction
> of the state and federal courts sitting in The City of New York,
> Borough of Manhattan, for the adjudication of any dispute
> hereunder or in connection herewith or with any transaction
> contemplated hereby or discussed herein, and hereby irrevocably
> waives, and agrees not to assert in any suit, action or proceeding,
> any claim that it is not personally subject to the jurisdiction of any
> such court, that such suit, action or proceeding is brought in an
> inconvenient forum or that the venue of such suit, action or
> proceeding is improper.

A copy of the Securities Purchase Agreement, the contract pursuant to which the Note was

issued to Kings Road, without its exhibits, is attached hereto as Exhibit B.

## FACTS

The Securities Purchase Agreement And The Note

9.      On March 9, 2006, Allied Defense completed a $30 million private placement of Senior Subordinated Convertible Notes (the "Notes") and Warrants (the "Warrants") initially exercisable into 226,800 shares of the Company's common stock, $0.10 par value per share. The Company's common stock, $0.10 par value per share, is hereinafter referred to as the "Common Stock". The Notes are convertible into shares of Common Stock and, on the date of their issuance, the conversion price per share of Common Stock was $26.4551 (subject to adjustment in certain circumstances). The purchasers of the Notes were Kings Road, in the amount of twelve million five hundred thousand dollars ($12,500,000), Portside Growth & Opportunity Fund ("Portside") in the amount of seven million five hundred thousand dollars ($7,500,000), Castlerigg Master Investments Ltd. ("Castlerigg") in the amount of six million dollars ($6,000,000), and LBI Group, Inc. ("LBI Group") in the amount of four million dollars ($4,000,000) (collectively, the "Note Holders").

10.     To effectuate the private placement, on March 9, 2006, Allied Defense entered into the Securities Purchase Agreement with Kings Road and the other Note Holders. Pursuant to the Securities Purchase Agreement, also on March 9, 2006, the Company executed the Note in the amount of $12.5 million in favor of Kings Road. Notes were executed in favor of each of the other Note Holders as well.

11.     The Note provides, among other things, that Kings Road may require the Company to redeem the Note if there is an Event of Default thereunder: "[u]pon the occurrence of an Event of Default with respect to th[e] Note . . . the Holder may require the Company to redeem all or any portion of th[e] Note[.]" (Exhibit A at § 4(b)). In addition, the Note provides

3

that "[u]pon the occurrence and during the continuance of an Event of Default, the Interest Rate shall be increased to twelve and one-half percent (12.5%.)" (Exhibit A at § 2.)

Events Of Default Under Note Section 4(a)(x)

12.    Section 4(a)(x) of the Note provides that an Event of Default occurs if: "the Company breaches any representation, warranty, covenant or other material term or condition of any Transaction Document, except, in the case of a breach of a covenant which is curable, only if such breach continues for a period of at least ten (10) consecutive Business Days." Included among the Transaction Documents are the Notes, the Warrants, the Securities Purchase Agreement as well as a Registration Rights Agreement dated as of March 9, 2006, and entered into between Allied Defense and Kings Road, among others (the "Registration Rights Agreement"). A copy of the Registration Rights Agreement is attached hereto as Exhibit C.

13.    In Section 3 of the Securities Purchase Agreement, "[t]he Company represent[ed] and warrant[ed] to each of the [Note Holders]" that, as of March 9, 2006, among other things:

a.    No event, liability, development or circumstance had occurred or existed with respect to the Company or its Subsidiaries or their respective business, properties, operations or financial condition, that would be required to be disclosed by the Company on a registration statement, and which had not been publicly announced (Exhibit B at § 3(m));

b.    The Company and each of its Subsidiaries maintained a system of internal accounting controls sufficient to provide reasonable assurance that, among other things, "transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset and liability accountability" (Exhibit B at § 3(aa)(ii));

c.    As of their respective dates, the Company's filings with the Securities and Exchange Commission (the "SEC") during the two (2) years prior to March 9, 2006, "complied in all material respects with the requirements of the [Securities Exchange Act of 1934], and the rules and regulations of the SEC promulgated thereunder," and none of those filings, "at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein,

4

in the light of the circumstances under which they were made, not misleading."
(Exhibit B at § 3(k));

d.    "Since the Company's most recently filed audited financial statements
contained in a Form 10-K, [which had been for the year ended December 31,
2004,] there has been no material adverse change and no material adverse
development in the business, properties, operations, condition (financial or
otherwise), results of operations or prospects of the Company." (Exhibit B at
§ 3(l)); and

e.    The Company and its Subsidiaries had no liabilities or obligations required
to be disclosed in its filings with the SEC during the prior two (2) years, but not
so disclosed therein, "other than those incurred in the ordinary course of the
Company's or its Subsidiaries' respective businesses and which, individually, or in
the aggregate, d[id] not or would not reasonably be expected to have a Material
Adverse Effect," which is defined in § 3(a) of the Securities Purchase Agreement
to mean: "any of (i) a material and adverse effect on the legality, validity or
enforceability of any Transaction Document, (ii) a material and adverse effect on
the results of operations, assets, prospects, business or condition (financial or
otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) an
adverse impairment to the Company's ability to perform on a timely basis its
obligations under any Transaction Document." (Exhibit B at §§ 3(q)(ix) and
3(a)).

14.    As explained below, the Company has breached each of the

representations, warranties and covenants enumerated above and each breach constitutes an

Event of Default under the Note.

15.    In the Company's Form 10-K/A for the year ended December 31, 2004,

which it filed with the SEC on October 5, 2005, the Company disclosed, among other things:

In February 2005, [the Company's] management had concluded that Allied did
not qualify for the use of hedge accounting due to the fact that Allied did not have
the appropriate policies, procedures or documentation to support the use of hedge
accounting for its foreign currency contracts. At December 31, 2004, the
Company did not have the necessary controls over financial reporting in place to
properly identify the lack of documentation, which is necessary to properly
evaluate a derivative instrument to determine if hedge accounting is appropriate,
or to perform the required computation and evaluation of hedge effectiveness.
This resulted in the restatement of amounts previously reported in the Company's
consolidated balance sheet at December 31, 2003 and the related consolidated
statements of earnings, stockholders' equity and cash flows for each of the two
years in the period ended December 31, 2003, and for the first nine months of
2004. In addition, certain disclosures in other notes to the consolidated financial

statements were restated to reflect the restatement adjustments. The matters consist of certain errors related primarily to transactions initially recorded in periods from 2001 to 2003, but affecting periods from 2001 through 2004.

16.    In its Form 10-K/A for the year ended December 31, 2005, which it filed with the SEC on November 7, 2006, the Company disclosed that it had "identified six material weaknesses in [its] internal control over financial reporting." (Allied Defense's Form 10-K/A for the year ended December 31, 2005 at F-3). Those material weaknesses included: (a) deficiencies in the "design of controls in place relating to estimates for warranty reserves at [the Company's] Belgian subsidiary, VSK Electronics"; (b) deficiencies in the "accounting for foreign currency exchange (FX) contracts of [the Company's] foreign operations"; (c) deficiencies in "accounting for contract costs at [the Company's] Belgian subsidiary MECAR SA; (d) deficiencies in the "accounting for inventory costs at certain U.S. Subsidiaries"; (e) a "lack of documentation and testing of the Company's IT general controls;" and (f) the "Company's inadequate financial reporting processes." *Id.* at F-3-F-4.

17.    In addition, the Company disclosed in its Form 8-K Current Report, which it filed with the SEC on February 9, 2007, that its Audit Committee had determined on February 6, 2007 that "certain financial statements for the three and nine month periods ended September 30, 2006, should no longer be relied upon because of an error in such financial statements."

18.    Furthermore, the Company disclosed in its Form 12b-25 Notification of Late Filing, which it filed with the SEC on March 19, 2007, that it had "determined that it must delay the filing of its Form 10K for the period ending December 31, 2006 in order to afford the Company an opportunity to finalize the financial statements as well as the management report on internal controls over financial reporting[.]" The Form 12b-25 also indicated that, at the time of such filing, "the Company's Form 10-K [would] disclose a material weakness at [its] Belgian

6

subsidiary, MECAR, S.A., for not accurately maintaining the contract cost accounting ledger. A second material weakness [would] disclose that the circumstances leading the Company's third quarter restatement [*sic*] as will as [*sic*] the Company's general consolidation and reporting processes were not adequate to meet the needs of the public reporting requirements during 2006."

19.    As a result of the matters described in the foregoing disclosures, the Company breached the representations and warranties set forth in Paragraphs 13 (a) through (e) above, and that, therefore, a default has occurred under Section 4(a)(x) of the Note.

Events Of Default Under Note Sections 4(a)(i) And 4(a)(v)

20.    Section 2(a) of the Registration Rights Agreement provides that the Company is to file a Registration Statement to "register for resale at least that number of shares of Common Stock equal to the Required Registration Amount determined as of the date such Registration Statement is initially filed with the SEC." The "Required Registration Amount" is defined in the Registration Rights Agreement as:

> 120% of the sum of (x) the number of Conversion Shares issued and issuable pursuant to the Notes as of the trading day immediately preceding the applicable date of determination and (y) the number of Warrant Shares issued and issuable pursuant to the Warrants as of the trading day immediately preceding the applicable date of determination, subject to adjustment as provided in Section 2(e), without regard to any limitations on conversions or redemptions of the Notes or exercises of the Warrants.

Exhibit C at § 1(m).

21.    The Registration Rights Agreement also provides that the "Company shall use its best efforts to have each the [*sic*] Registration Statement declared effective by the SEC as soon as practicable, but in no event later than the Effectiveness Deadline." Exhibit C at § 2(a).

22.    Pursuant to Section 4(a)(i) of the Note, an Event of Default occurs upon:

the failure of the applicable Registration Statement required to be filed pursuant to the Registration Rights Agreement to be declared effective by the SEC on or prior to the date that is sixty (60) days after the applicable Effectiveness Deadline (as defined in the Registration Rights Agreement), or, while the applicable Registration Statement is required to be maintained effective pursuant to the terms of the Registration Rights Agreement, the effectiveness of the applicable Registration Statement lapses for any reason (including, without limitation, the issuance of a stop order) or is unavailable to any holder of the Notes for sale of all of such holder's Registrable Securities (as defined in the Registration Rights Agreement) in accordance with the terms of the Registration Rights Agreement, and such lapse or unavailability continues for a period of ten (10) consecutive days or for more than an aggregate of thirty (30) days in any 365-day period (other than days during an Allowable Grace Period (as defined in the Registration Rights Agreement))[.]

Exhibit A at § 4(a)(i).

23.    The Effectiveness Deadline is defined in the Registration Rights

Agreement as "the date which is 60 days after the earlier of the Filing Date and the Filing

Deadline, or if there is a full review of the Registration Statement by the SEC, 120 days after the

earlier of the Filing Date and the Filing Deadline." Exhibit C at § 1(d).

24.    The Filing Date of the Company's Registration Statement with the SEC

was November 7, 2006.

25.    The Filing Deadline was September 30, 2006, because it was "the earlier

of (i) September 30, 2006 and (ii) 45 days after the Company file[d] its annual report on Form

10-K for the year ended December 31, 2005," the 45-day period having elapsed on November

24, 2006. Exhibit C at § 1(f).

26.    Given the Company's failure to file the Registration Statement by the

Filing Deadline, it was required to make "Registration Delay Payments" under Section 2(f) of the

Registration Rights Agreement. That section requires Registration Delay Payments to be paid if,

*inter alia*, the Company misses the Filing Deadline or if the Registration Statement is not

8

declared effective by the SEC by the Effectiveness Deadline. Pursuant to the foregoing, the

Company was required to make Registration Delay Payments to Kings Road on October 1, 2006,

October 31, 2006 and November 7, 2006. Notwithstanding its obligation to do so, the Company

failed to make timely Registration Delay Payments, which constituted an Event of Default under

Section 4(a)(v) of the Note. That section provides that the following constitutes an Event of

Default:

> the Company's failure to pay to the Holder any amount of Principal (including, without limitation, the Company's failure to pay any redemption or make-whole payments), Interest, Late Charges or other amounts when and as due under this Note or any other Transaction Document (as defined in the Securities Purchase Agreement) or any other agreement, document, certificate or other instrument delivered in connection with the transactions contemplated hereby and thereby to which the Holder is a party, except, in the case of a failure to pay Interest and Late Charges when and as due, in which case only if such failure continues for a period of at least five (5) Business Days[.]

Exhibit A at § 4(a)(v).

27.    In addition, the Effectiveness Deadline has not been met. Because there

was a full review of the Registration Statement by the SEC, the Effectiveness Deadline was

January 28, 2007, which was one hundred and twenty (120) days after September 30, 2006.

Sixty (60) days after the Effectiveness Deadline was March 29, 2007. The required Registration

Statement for the Required Registration Amount of shares of Common Stock was not declared

effective by the SEC by March 29, 2007, and, in fact, no Registration Statement has been

declared effective by the SEC for such shares of Common Stock as of the date of this Complaint.

Accordingly, an Event of Default has occurred under Section 4(a)(i) of the Note.

28.    The Company has acknowledged that the Effectiveness Deadline has not

been met inasmuch as it has made Registration Delay Payments with respect thereto since that

time.

Kings Road Demands Redemption

29.     On December 18, 2006, Kings Road sent Allied Defense an Event of
Default Redemption Notice via facsimile and overnight courier stating that an Event of Default
had occurred under Section 4(a)(v) of the Note because of the Company's failure to timely pay
Registration Delay Payments with respect to its having missed the Filing Deadline. A copy of
Kings Road's December 18, 2006 Event of Default Redemption Notice to the Company is
attached hereto as Exhibit D. The letter notified the Company of its election to "exercise its
redemption right pursuant to Section 4(b) of the Note . . . [and of its] elect[ion] to redeem the
entire Note in full at the Event of Default Redemption Price." The letter further informed the
Company that, pursuant to Section 12(a) of the Note, it was to pay Kings Road the Event of
Default Redemption Price within five (5) business days of receipt of the Event of Default
Redemption Notice.

30.     Subsequently, the Company made the outstanding Registration Delay
Payments. Kings Road thereafter agreed to withdraw its December 18, 2006 Event of Default
Redemption Notice, but expressly reserved all of its rights with respect to the subject Event of
Default.

31.     Under the Note, a Note Holder is entitled to submit an Event of Default
Redemption Notice at any time following the occurrence of an Event of Default, whether or not
such Event of Default is continuing or subsequently cured. Accordingly, even though Allied
Defense made the overdue Registration Delay Payments to Kings Road, the Event of Default
remained outstanding.

32.     On February 20, 2007, Kings Road sent Allied Defense an Event of
Default Redemption Notice via facsimile and overnight courier identifying certain of the Events
of Default specified herein, including the Event of Default resulting from the Company's failure

10

to make timely Registration Delay Payments, and stating that it was notifying the Company of "its election to exercise its redemption right pursuant to Section 4(b) of the Note . . . [and of its] elect[ion] to redeem the entire Note in full at the Event of Default Redemption Price." A copy of Kings Road's February 20, 2007 Event of Default Redemption Notice to the Company is attached hereto as Exhibit E. The letter further informed the Company that, pursuant to Section 12(a) of the Note, it was to pay Kings Road the Event of Default Redemption Price within five (5) business days of receipt of the Event of Default Redemption Notice.

33.    On March 2, 2007, Kings Road sent the Company another Event of Default Redemption Notice, also via facsimile and overnight courier, stating that, pursuant to its February 20, 2007 Event of Default Redemption Notice, it had "elected to redeem the entire Note in full at the Event of Default Redemption Price . . . [and that] [i]n accordance with the terms of the Note, the Company was obligated to pay [Kings Road] the Event of Default Redemption Price no later than February 27, 2007," but had "failed to do so." A copy of Kings Road's March 2, 2007 Event of Default Redemption Notice to the Company is attached hereto as Exhibit F.

34.    In its March 2, 2007 letter, Kings Road reminded Allied Defense that "the failure to pay the Event of Default Redemption Price prior to the date of th[e] letter constitute[d] an additional Event of Default" under Section 4(a)(v) of the Note.

35.    Furthermore, because the Company has failed to timely pay Kings Road the Event of Default Redemption Price, the Company also owes late charges to Kings Road. Section 25(b) of the Note provides:

> Any amount of Principal or other amounts due under the Transaction Documents, other than Interest, which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate of twelve and one-half percent (12.5%) per annum from the date such amount was due until the same is paid in full ("Late Charge").

11

Exhibit A at § 25(b).

36.    On March 30, 2007, Kings Road sent another Event of Default
Redemption Notice to the Company via facsimile and overnight courier. Kings Road advised the
Company that "[b]ecause the Registration Statement ha[d] not been declared effective with the
SEC as of the date of th[e] letter, which is more than sixty (60) days after Effectiveness
Deadline, pursuant to Section 4(a)(i) of the Note an additional Event of Default has occurred and
is continuing." A copy of Kings Road's March 30, 2007 Event of Default Redemption Notice to
the Company is attached hereto as Exhibit G.

37.    As set forth above, pursuant to the Note, and in response to Kings Road's
multiple Event of Default Redemption Notices, the Company was obligated to deliver the Event
of Default Redemption Price, as defined in Section 4(b) of the Note, to Kings Road within five
(5) business days of its receipt of Kings Road's first demand for redemption. (Exhibit A at
§ 12(a).)

38.    As of the date of filing of this Complaint, the Company has failed to pay
Kings Road the Event of Default Redemption Price.

39.    In Form 8-Ks the Company filed with the SEC on March 20, 2007 and
March 26, 2007, the Company disclosed not only that Kings Road had asserted events of default,
but also that Portside, LBI Group and Castlerigg asserted events of default under the Notes and
sought redemption of the Notes in their entirety, plus redemption premiums and default interest.

## CLAIM FOR RELIEF

(Breach of Contract - Against Allied Defense)

40.    Kings Road repeats and realleges each and every allegation set forth in
paragraphs 1 through 39 above as though fully set forth herein.

41.    As described above, Allied Defense has breached its representations, warranties and covenants under the Transaction Documents.

42.    Based on these Events of Default, Kings Road has demanded that the Company redeem the Note.

43.    Despite its clear contractual obligation to do so, Allied Defense has refused to comply.

44.    As a result, Kings Road has been damaged in an amount to be determined at trial, but which is not less than sixteen million six hundred sixty-four thousand eight hundred and fifty-four dollars ($16,664,854), which is comprised of the Event of Default Redemption Price, as defined in Section 4(b) of the Note, and the accrued and unpaid Registration Delay Payments (in each case calculated as of the date of filing of this Complaint), plus interest accruing thereon.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.    Money damages of not less than sixteen million six hundred sixty-four thousand eight hundred and fifty-four dollars ($16,664,854), plus interest accruing thereon;

B.    Costs and reasonable attorneys' fees in enforcing its rights in bringing this action; and

C.    Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       April 23, 2007

SCHULTE ROTH & ZABEL LLP

By: _____
       Alan R. Glickman (ARG-0927)
       Dana M. Roth (DMR-1438)
       919 Third Avenue
       New York, New York  10022
       (212) 756-2000
       *Attorneys for Kings Road Investments Ltd.*

EXHIBIT A

## SENIOR SUBORDINATED CONVERTIBLE NOTE

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS NOTE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD OR TRANSFERRED OR ASSIGNED UNLESS (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE 1933 ACT, OR (B) PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE, INCLUDING SECTIONS 3(c)(iii) AND 19(a) HEREOF. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 3(c)(iii) OF THIS NOTE.

### THE ALLIED DEFENSE GROUP, INC.

#### SENIOR SUBORDINATED CONVERTIBLE NOTE

Issuance Date: March 9, 2006                Original Principal Amount: U.S. $12,500,000

FOR VALUE RECEIVED, The Allied Defense Group, Inc., a Delaware corporation (the "**Company**"), hereby promises to pay to the order of KINGS ROAD INVESTMENTS LTD. or registered assigns ("**Holder**") the amount set out above as the Original Principal Amount (as reduced pursuant to the terms hereof pursuant to redemption, conversion or otherwise, the "**Principal**") when due, whether upon the Maturity Date (as defined below), acceleration, redemption or otherwise (in each case in accordance with the terms hereof) and to pay interest ("**Interest**") on any outstanding Principal at a rate per annum equal to the Interest Rate (as defined below), from the date set out above as the Issuance Date (the "**Issuance Date**") until the same becomes due and payable, whether upon an Interest Date (as defined below), the Maturity Date, acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof).  This Senior Subordinated Convertible Note (including all Senior Subordinated Convertible Notes issued in exchange, transfer or replacement hereof, this "**Note**") is one of an issue of Senior Subordinated Convertible Notes (collectively, the "**Notes**" and such

other Senior Subordinated Convertible Notes, the **"Other Notes"**) issued pursuant to the Securities Purchase Agreement (as defined below). Certain capitalized terms used herein are defined in Section 30.

(1)    MATURITY. On the Maturity Date, the Holder shall surrender this Note to the Company and the Company shall pay to the Holder an amount in cash representing all outstanding Principal, accrued and unpaid Interest and accrued and unpaid Late Charges, if any. The **"Maturity Date"** shall be March 9, 2011, as may be extended at the option of the Holder (i) in the event that, and for so long as, an Event of Default (as defined in Section 4(a)) shall have occurred and be continuing or any event shall have occurred and be continuing which with the passage of time and the failure to cure would result in an Event of Default and (ii) through the date that is ten days after the consummation of a Change of Control in the event that a Change of Control is publicly announced or a Change of Control Notice (as defined in Section 5) is delivered prior to the Maturity Date.

(2)    INTEREST. Interest on this Note shall commence accruing on the Issuance Date and shall be computed on the basis of a 365-day year and actual days elapsed and shall be payable in arrears on the last day of each Calendar Quarter during the period beginning on the Issuance Date and ending on, and including, the Maturity Date (each, an **"Interest Date"**) with the first Interest Date being March 31, 2006. Interest shall be payable on each Interest Date, to the record holder of this Note on the applicable Interest Date. Prior to the payment of Interest on an Interest Date, Interest on this Note shall accrue at the Interest Rate and be payable in cash upon any conversion in accordance with Section 3(c)(i). Upon the occurrence and during the continuance of an Event of Default, the Interest Rate shall be increased to twelve and one-half percent (12.5%). In the event that such Event of Default is subsequently cured, the adjustment referred to in the preceding sentence shall cease to be effective as of the date of such cure; provided that the Interest as calculated at such increased rate during the continuance of such Event of Default shall continue to apply to the extent relating to the days after the occurrence of such Event of Default through and including the date of cure of such Event of Default.

(3)    CONVERSION OF NOTES. This Note shall be convertible into shares of common stock of the Company, $0.10 par value per share (the **"Common Stock"**), on the terms and conditions set forth in this Section 3.

(a)    Conversion Right. Subject to the provisions of Section 3(d), at any time or times on or after the Issuance Date, the Holder shall be entitled to convert any portion of the outstanding and unpaid Conversion Amount (as defined below) into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below). The Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share. The Company shall pay any and all taxes that may be payable with respect to the initial issuance and delivery of Common Stock upon conversion of any Conversion Amount.

(b)    Conversion Rate. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be

determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the **"Conversion Rate"**).

(i)    **"Conversion Amount"** means the portion of the Principal to be converted, redeemed or otherwise with respect to which this determination is being made.

(ii)    **"Conversion Price"** means, as of any Conversion Date (as defined below) or other date of determination, $26.4551, subject to adjustment as provided herein.

(c)    Mechanics of Conversion.

(i)    Optional Conversion. To convert any Conversion Amount into shares of Common Stock on any date (a **"Conversion Date"**), the Holder shall (A) transmit by facsimile (or otherwise deliver), for receipt on or prior to 11:59 p.m., New York Time, on such date, a copy of an executed notice of conversion in the form attached hereto as Exhibit I (the **"Conversion Notice"**) to the Company and (B) if required by Section 3(c)(iv), surrender this Note to a nationally recognized overnight delivery service for delivery to the Company (or an indemnification undertaking with respect to this Note in the case of its loss, theft or destruction). On or before the second (2nd) Trading Day following the date of receipt of a Conversion Notice, the Company shall transmit by facsimile a confirmation of receipt of such Conversion Notice to the Holder and the Company's transfer agent (the **"Transfer Agent"**). On or before the third (3rd) Trading Day following the date of receipt of a Conversion Notice (the **"Share Delivery Date"**), the Company shall (1) (X) provided that the Transfer Agent is participating in the Fast Automated Securities Transfer Program of the Depository Trust Company (**"DTC"**) credit such aggregate number of shares of Common Stock to which the Holder shall be entitled to the Holder's or its designee's balance account with DTC through its Deposit Withdrawal Agent Commission system or (Y) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the address as specified in the Conversion Notice, a certificate, registered in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder shall be entitled, (2) pay to the Holder in cash an amount equal to the accrued and unpaid Interest on the Conversion Amount up to and including the Conversion Date and (3) for any conversions prior to the third (3rd) anniversary of the Issuance Date, pay any applicable Make-Whole Amount in accordance with Section 3(c)(ii). If this Note is physically surrendered for conversion as required by Section 3(c)(iv) and the outstanding Principal of this Note is greater than the Principal portion of the Conversion Amount being converted, then the Company shall as soon as practicable and in no event later than three Business Days after receipt of this Note and at its own expense, issue and deliver to the holder a new Note (in accordance with Section 19(d)) representing the outstanding Principal not converted. The Person or Persons entitled to receive the shares of Common Stock issuable upon a conversion of this Note shall be treated for all purposes as the record holder or holders of such shares of Common Stock on the Conversion Date.

(ii)    Make-Whole Amount. If prior to the third (3rd) anniversary of the Issuance Date, the Holder converts all or any portion of this Note pursuant to Section 3(c)(i) or the Company redeems all or any portion of this Note pursuant to Section 9, then upon such conversion or redemption, the Holder shall receive the Make-Whole Amount; provided, however, that in the event that the Closing Sale Price of the Common Stock exceeds 140% of the initial Conversion Price (as adjusted for any stock split, combination, reclassification or similar transaction) for each of twenty (20) Trading Days out of the thirty (30) consecutive Trading Day period ended on the Trading Day immediately prior to the Conversion Date, then the Holder shall not be entitled to receive the Make-Whole Amount. The Company shall pay any Make-Whole Amount in cash.

(iii)    Company's Failure to Timely Convert. If the Company shall fail to issue a certificate to the Holder or credit the Holder's balance account with DTC, as applicable, for the number of shares of Common Stock to which the Holder is entitled upon conversion of any Conversion Amount on or prior to the date which is five (5) Trading Days after the Conversion Date (a "Conversion Failure"), then (A) the Company shall pay damages to the Holder for each Trading Day of such Conversion Failure in an amount equal to 1.0% of the product of (I) the sum of the number of shares of Common Stock not issued to the Holder on or prior to the Share Delivery Date and to which the Holder is entitled, and (II) the Closing Sale Price of the Common Stock on the Share Delivery Date and (B) the Holder, upon written notice to the Company, may void its Conversion Notice with respect to, and retain or have returned, as the case may be, any portion of this Note that has not been converted pursuant to such Conversion Notice; provided that the voiding of a Conversion Notice shall not affect the Company's obligations to make any payments which have accrued prior to the date of such notice pursuant to this Section 3(c)(iii) or otherwise. In addition to the foregoing, if within three (3) Trading Days after the Company's receipt of the facsimile copy of a Conversion Notice the Company shall fail to issue and deliver a certificate to the Holder or credit the Holder's balance account with DTC for the number of shares of Common Stock to which the Holder is entitled upon such holder's conversion of any Conversion Amount, and if on or after such Trading Day the Holder purchases (in an open market transaction or otherwise) Common Stock to deliver in satisfaction of a sale by the Holder of Common Stock issuable upon such conversion that the Holder anticipated receiving from the Company (a "Buy-In"), then the Company shall, within three (3) Trading Days after the Holder's request and in the Holder's discretion, either (i) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (the "Buy-In Price"), at which point the Company's obligation to deliver such certificate (and to issue such Common Stock) shall terminate, or (ii) promptly honor its obligation to deliver to the Holder a certificate or certificates representing such Common Stock and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of Common Stock, times (B) the Closing Bid Price on the Conversion Date.

(iv)    Book-Entry. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company

unless (A) the full Conversion Amount represented by this Note is being converted or (B) the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender. The Holder and the Company shall maintain records showing the Principal converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Company, so as not to require physical surrender of this Note upon conversion.

(v) Pro Rata Conversion; Disputes. In the event that the Company receives a Conversion Notice from more than one holder of Notes for the same Conversion Date and the Company can convert some, but not all, of such portions of the Notes submitted for conversion, the Company, subject to Section 3(d), shall convert from each holder of Notes electing to have Notes converted on such date a pro rata amount of such holder's portion of its Notes submitted for conversion based on the principal amount of Notes submitted for conversion on such date by such holder relative to the aggregate principal amount of all Notes submitted for conversion on such date. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 24.

(d) Limitations on Conversions.

(i) Beneficial Ownership. The Company shall not effect any conversion of this Note, and the Holder of this Note shall not have the right to convert any portion of this Note pursuant to Section 3(a), to the extent that after giving effect to such conversion, the Holder (together with the Holder's affiliates) would beneficially own in excess of 9.99% (the "**Maximum Percentage**") of the number of shares of Common Stock outstanding immediately after giving effect to such conversion. For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder and its affiliates shall include the number of shares of Common Stock issuable upon conversion of this Note with respect to which the determination of such sentence is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (A) conversion of the remaining, nonconverted portion of this Note beneficially owned by the Holder or any of its affiliates and (B) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any Other Notes or warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by the Holder or any of its affiliates. Except as set forth in the preceding sentence, for purposes of this Section 3(d)(i), beneficial ownership shall be calculated in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended. For purposes of this Section 3(d)(i), in determining the number of outstanding shares of Common Stock, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Form 10-KSB, Form 10-K, Form 10-QSB, Form 10-Q or Form 8-K, as the case may be (y) a more recent public announcement by the Company or (z) any other notice by the Company or the Transfer Agent setting forth the number of shares of Common Stock outstanding. For any reason at any time, upon the written

request of the Holder, the Company shall within two (2) Business Days confirm in writing to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Note, by the Holder or its affiliates since the date as of which such number of outstanding shares of Common Stock was reported. By written notice to the Company, the Holder may from time to time increase or decrease the Maximum Percentage to any other percentage not in excess of 9.99% specified in such notice; provided that (i) any such increase will not be effective until the sixty-first (61st) day after such notice is delivered to the Company, and (ii) any such increase or decrease will apply only to the Holder and not to any other holder of Notes.

(ii)     Principal Market Regulation.  The Company shall not be obligated to issue any shares of Common Stock upon conversion of this Note, and the Holder of this Note shall not have the right to receive upon conversion of this Note any shares of Common Stock, if the issuance of such shares of Common Stock would exceed the aggregate number of shares of Common Stock which the Company may issue upon conversion or exercise, as applicable, of the Notes and Warrants without breaching the Company's obligations under the rules or regulations of the Principal Market (the number of shares which may be issued without violating such rules and regulations, the **"Exchange Cap"**), except that such limitation shall not apply in the event that the Company (A) obtains the approval of its stockholders as required by the applicable rules of the Principal Market for issuances of Common Stock in excess of such amount or (B) obtains a written opinion from outside counsel to the Company that such approval is not required, which opinion shall be reasonably satisfactory to the Required Holders. Unless and until such approval or written opinion is obtained, no purchaser of the Notes pursuant to the Securities Purchase Agreement (the **"Purchasers"**) shall be issued in the aggregate, upon conversion or exercise, as applicable, of Notes or Warrants, shares of Common Stock in an amount greater than the product of the Exchange Cap multiplied by a fraction, the numerator of which is the principal amount of Notes issued to each Purchaser pursuant to the Securities Purchase Agreement on the Closing Date and the denominator of which is the aggregate principal amount of all Notes issued to the Purchasers pursuant to the Securities Purchase Agreement on the Closing Date (with respect to each Purchaser, the **"Exchange Cap Allocation"**). In the event that any Purchaser shall sell or otherwise transfer any of such Purchaser's Notes, the transferee shall be allocated a pro rata portion of such Purchaser's Exchange Cap Allocation, and the restrictions of the prior sentence shall apply to such transferee with respect to the portion of the Exchange Cap Allocation allocated to such transferee. In the event that any holder of Notes shall convert all of such holder's Notes into a number of shares of Common Stock which, in the aggregate, is less than such holder's Exchange Cap Allocation, then the difference between such holder's Exchange Cap Allocation and the number of shares of Common Stock actually issued to such holder shall be allocated to the respective Exchange Cap Allocations of the remaining holders of Notes on a pro rata basis in proportion to the aggregate principal amount of the Notes then held by each such holder.

(4)    RIGHTS UPON EVENT OF DEFAULT.

(a)    Event of Default.  Each of the following events shall constitute an **"Event of Default"**:

(i)    the failure of the applicable Registration Statement required to be filed pursuant to the Registration Rights Agreement to be declared effective by the SEC on or prior to the date that is sixty (60) days after the applicable Effectiveness Deadline (as defined in the Registration Rights Agreement), or, while the applicable Registration Statement is required to be maintained effective pursuant to the terms of the Registration Rights Agreement, the effectiveness of the applicable Registration Statement lapses for any reason (including, without limitation, the issuance of a stop order) or is unavailable to any holder of the Notes for sale of all of such holder's Registrable Securities (as defined in the Registration Rights Agreement) in accordance with the terms of the Registration Rights Agreement, and such lapse or unavailability continues for a period of ten (10) consecutive days or for more than an aggregate of thirty (30) days in any 365-day period (other than days during an Allowable Grace Period (as defined in the Registration Rights Agreement));

(ii)    the suspension from trading or failure of the Common Stock to be listed on an Eligible Market for a period of five (5) consecutive Trading Days or for more than an aggregate of ten (10) Trading Days in any 365-day period;

(iii)    the Company's (A) failure to cure a Conversion Failure by delivery of the required number of shares of Common Stock within ten (10) Business Days after the applicable Conversion Date or (B) written notice to any holder of the Notes, including by way of public announcement or through any of its agents, at any time, of its intention not to comply with a request for conversion of any Notes into shares of Common Stock that is tendered in accordance with the provisions of the Notes;

(iv)    at any time following the tenth (10th) consecutive Business Day that the Holder's Authorized Share Allocation is less than the number of shares of Common Stock that the Holder would be entitled to receive upon a conversion of the full Conversion Amount of this Note (without regard to any limitations on conversion set forth in Section 3(d) or otherwise);

(v)    the Company's failure to pay to the Holder any amount of Principal (including, without limitation, the Company's failure to pay any redemption or make-whole payments), Interest, Late Charges or other amounts when and as due under this Note or any other Transaction Document (as defined in the Securities Purchase Agreement) or any other agreement, document, certificate or other instrument delivered in connection with the transactions contemplated hereby and thereby to which the Holder is a party, except, in the case of a failure to pay Interest and Late Charges when and as due, in which case only if such failure continues for a period of at least five (5) Business Days;

(vi)    the occurrence of any default under, redemption of or acceleration prior to maturity of any Indebtedness of the Company or any of its Subsidiaries which, individually or in the aggregate, exceeds $250,000 (as defined in Section 3(a) of the Securities Purchase Agreement), other than with respect to any Other Notes;

(vii)    the Company or any of its Subsidiaries, pursuant to or within the meaning of Title 11, U.S. Code, or any similar Federal, foreign or state law for the relief of debtors (collectively, **"Bankruptcy Law"**), (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official (a **"Custodian"**), (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due;

(viii)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Company or any of its Subsidiaries in an involuntary case, (B) appoints a Custodian of the Company or any of its Subsidiaries or (C) orders the liquidation of the Company or any of its Subsidiaries;

(ix)    a final judgment or judgments for the payment of money aggregating in excess of $100,000 are rendered against the Company or any of its Subsidiaries and which judgments are not, within sixty (60) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within sixty (60) days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a credit worthy party shall not be included in calculating the $100,000 amount set forth above so long as the Company provides the Holder a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holder) to the effect that such judgment is covered by insurance or an indemnity and the Company will receive the proceeds of such insurance or indemnity within thirty (30) days of the issuance of such judgment;

(x)    the Company breaches any representation, warranty, covenant or other material term or condition of any Transaction Document, except, in the case of a breach of a covenant which is curable, only if such breach continues for a period of at least ten (10) consecutive Business Days;

(xi)    any breach or failure in any respect to comply with Section 4(r) of the Securities Purchase Agreement or Section 15 of this Note, except in the case of a failure to satisfy the Quarterly Test, in which case only if such failure continues for a period of at least thirty (30) days; or

(xii)    any Event of Default (as defined in the Other Notes) occurs with respect to any Other Notes.

(b)    Redemption Right. Upon the occurrence of an Event of Default with respect to this Note or any Other Note, the Company shall within two (2) Business Days deliver written notice thereof via facsimile and overnight courier (an **"Event of Default Notice"**)

to the Holder. At any time after the earlier of the Holder's receipt of an Event of Default Notice and the Holder becoming aware of an Event of Default, the Holder may require the Company to redeem all or any portion of this Note by delivering written notice thereof (the **"Event of Default Redemption Notice"**) to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note the Holder is electing to redeem. Each portion of this Note subject to redemption by the Company pursuant to this Section 4(b) shall be redeemed by the Company at a price equal to the sum of (i) any accrued and unpaid Interest on the Conversion Amount to be redeemed and any accrued and unpaid Late Charges on such Conversion Amount and Interest and (ii) the greater of (A) the product of (1) the Conversion Amount to be redeemed and (2) the Redemption Premium and (B) the product of (1) the Conversion Rate with respect to such Conversion Amount in effect at such time as the Holder delivers an Event of Default Redemption Notice and (2) the Closing Sale Price of the Common Stock on the date immediately preceding such Event of Default (the **"Event of Default Redemption Price"**). Redemptions required by this Section 4(b) shall be made in accordance with the provisions of Section 12. To the extent redemptions required by this Section 4(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 4(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any Redemption Premium due under this Section 4(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(5)    RIGHTS UPON FUNDAMENTAL TRANSACTION AND CHANGE OF CONTROL.

(a)    Assumption. The Company shall not enter into or be party to a Fundamental Transaction unless (i) the Successor Entity assumes in writing all of the obligations of the Company under this Note and the other Transaction Documents in accordance with the provisions of this Section 5(a) pursuant to written agreements in form and substance satisfactory to the Required Holders and approved by the Required Holders prior to such Fundamental Transaction, including agreements to deliver to each holder of Notes in exchange for such Notes a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to the Notes, including, without limitation, having a principal amount and interest rate equal to the principal amounts and the interest rates of the Notes held by such holder, having similar conversion rights as the Notes and having similar ranking to the Notes and (ii) the Successor Entity (including its Parent Entity) is a publicly traded corporation whose common stock is quoted on or listed for trading on an Eligible Market. Upon the occurrence of any Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Note referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Note with the same effect as if such Successor Entity had been named as the Company herein. Upon consummation of the Fundamental Transaction, the Successor Entity shall deliver to the Holder confirmation that there shall be issued upon conversion or redemption of this Note at any time after the consummation of the Fundamental Transaction, in lieu of the

10089644.2                                    - 9 -

shares of Common Stock (or other securities, cash, assets or other property) issuable upon the conversion of the Notes prior to such Fundamental Transaction, such shares of publicly traded common stock (or their equivalent) of the Successor Entity, as adjusted in accordance with the provisions of this Note. The provisions of this Section shall apply similarly and equally to successive Fundamental Transactions and shall be applied without regard to any limitations on the conversion of this Note.

(b)    Redemption Right. No sooner than fifteen (15) days nor later than ten (10) days prior to the consummation of a Change of Control, but not prior to the public announcement of such Change of Control, the Company shall deliver written notice thereof via facsimile and overnight courier to the Holder (a **"Change of Control Notice"**). At any time during the period (the **"Change of Control Period"**) beginning after the Holder's receipt of a Change of Control Notice and ending on the date that is twenty (20) Trading Days after the consummation of such Change of Control, the Holder may require the Company to redeem all or any portion of this Note by delivering written notice thereof (**"Change of Control Redemption Notice"**) to the Company, which Change of Control Redemption Notice shall indicate the Conversion Amount the Holder is electing to redeem. The portion of this Note subject to redemption pursuant to this Section 5 shall be redeemed by the Company in cash at a price equal to the greater of (i) the sum of (x) the product of the Change of Control Redemption Premium and the Conversion Amount being redeemed and (y) the amount of any accrued but unpaid Interest thereon through the date of such redemption payment and (ii) the product of (x) the Equity Value Redemption Premium and (y) the sum of (1) the product of (A) the Conversion Amount being redeemed multiplied by (B) the quotient determined by dividing (I) the aggregate cash consideration and the aggregate cash value of any non-cash consideration per Common Share to be paid to the holders of the Common Shares upon consummation of the Change of Control (any such non-cash consideration consisting of marketable securities to be valued at the higher of the Closing Sale Price of such securities as of the Trading Day immediately prior to or the Trading Day following the public announcement of such proposed Change of Control) by (II) the Conversion Price plus (2) the amount of any accrued but unpaid Interest on such Conversion Amount being redeemed through the date of such redemption payment, (the **"Change of Control Redemption Price"**). Redemptions required by this Section 5 shall be made in accordance with the provisions of Section 12 and shall have priority to payments to shareholders in connection with a Change of Control. To the extent redemptions required by this Section 5(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 5, until the Change of Control Redemption Price (together with any interest thereon) is paid in full, the Conversion Amount submitted for redemption under this Section 5(c) may be converted, in whole or in part, by the Holder into shares of Common Stock, or in the event the Conversion Date is after the consummation of the Change of Control, shares of publicly traded common stock (or their equivalent) of the Successor Entity pursuant to Section 3. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 5(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any redemption premium due under this Section 5(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(6)    RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS AND OTHER CORPORATE EVENTS.

(a)    Purchase Rights. If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the **"Purchase Rights"**), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(b)    Other Corporate Events. In addition to and not in substitution for any other rights hereunder, prior to the consummation of any Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities or other assets with respect to or in exchange for shares of Common Stock (a **"Corporate Event"**), the Company shall make appropriate provision to insure that the Holder will thereafter have the right to receive upon a conversion of this Note, at the Holder's option, (i) in addition to the shares of Common Stock receivable upon such conversion, such securities or other assets to which the Holder would have been entitled with respect to such shares of Common Stock had such shares of Common Stock been held by the Holder upon the consummation of such Corporate Event (without taking into account any limitations or restrictions on the convertibility of this Note) or (ii) in lieu of the shares of Common Stock otherwise receivable upon such conversion, such securities or other assets received by the holders of shares of Common Stock in connection with the consummation of such Corporate Event in such amounts as the Holder would have been entitled to receive had this Note initially been issued with conversion rights for the form of such consideration (as opposed to shares of Common Stock) at a conversion rate for such consideration commensurate with the Conversion Rate. The provisions of this Section shall apply similarly and equally to successive Corporate Events and shall be applied without regard to any limitations on the conversion or redemption of this Note.

(7)    RIGHTS UPON ISSUANCE OF OTHER SECURITIES.

(a)    Adjustment of Conversion Price upon Issuance of Common Stock. If and whenever on or after the Subscription Date, the Company issues or sells, or in accordance with this Section 7(a) is deemed to have issued or sold, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding shares of Common Stock deemed to have been issued or sold by the Company in connection with any Excluded Security) for a consideration per share less than a price (the **"Applicable Price"**) equal to the Conversion Price in effect immediately prior to such issue or sale (the foregoing a **"Dilutive Issuance"**), then immediately after such Dilutive Issuance, the Conversion Price then in effect shall be reduced to an amount equal the product of (A) the Conversion Price in effect immediately prior to such Dilutive Issuance and (B) the quotient determined by dividing (1) the sum of (I) the product derived by multiplying the Conversion Price in effect immediately prior to such Dilutive Issuance and the number of shares

of Common Stock Deemed Outstanding immediately prior to such Dilutive Issuance plus (II) the consideration, if any, received by the Company upon such Dilutive Issuance, by (2) the product derived by multiplying (I) the Conversion Price in effect immediately prior to such Dilutive Issuance by (II) the number of shares of Common Stock Deemed Outstanding immediately after such Dilutive Issuance. For purposes of determining the adjusted Conversion Price under this Section 7(a), the following shall be applicable:

            (i)     Issuance of Options. If the Company in any manner grants or sells any Options and the lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Option or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of such Option is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 7(a)(i), the "lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Option or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of such Option" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon granting or sale of the Option, upon exercise of the Option and upon conversion or exchange or exercise of any Convertible Security issuable upon exercise of such Option. No further adjustment of the Conversion Price shall be made upon the actual issuance of such share of Common Stock or of such Convertible Securities upon the exercise of such Options or upon the actual issuance of such Common Stock upon conversion or exchange or exercise of such Convertible Securities.

            (ii)     Issuance of Convertible Securities. If the Company in any manner issues or sells any Convertible Securities and the lowest price per share for which one share of Common Stock is issuable upon such conversion or exchange or exercise thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share. For the purposes of this Section 7(a)(ii), the "lowest price per share for which one share of Common Stock is issuable upon such conversion or exchange or exercise" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security. No further adjustment of the Conversion Price shall be made upon the actual issuance of such share of Common Stock upon conversion or exchange or exercise of such Convertible Securities, and if any such issue or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of the Conversion Price had been or are to be made pursuant to other provisions of this Section 7(a), no further adjustment of the Conversion Price shall be made by reason of such issue or sale.

            (iii)     Change in Option Price or Rate of Conversion. If the purchase price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exchange or exercise of any Convertible Securities, or the

rate at which any Convertible Securities are convertible into or exchangeable or exercisable for Common Stock changes at any time, the Conversion Price in effect at the time of such change shall be adjusted to the Conversion Price which would have been in effect at such time had such Options or Convertible Securities provided for such changed purchase price, additional consideration or changed conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 7(a)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Subscription Date are changed in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such change. No adjustment shall be made if such adjustment would result in an increase of the Conversion Price then in effect.

(iv)     Calculation of Consideration Received. In case any Option is issued in connection with the issue or sale of other securities of the Company, together comprising one integrated transaction in which no specific consideration is allocated to such Options by the parties thereto, the Options will be deemed to have been issued for a consideration of $.01. If any Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration received therefor will be deemed to be the net amount received by the Company therefor. If any Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of the consideration as determined in good faith by the Board of Directors other than cash received by the Company will be the fair value of such consideration, except where such consideration consists of securities, in which case the amount of consideration received by the Company will be the Closing Sale Price of such securities on the date of receipt. If any Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such Common Stock, Options or Convertible Securities, as the case may be. The fair value of any consideration other than cash or securities will be determined in good faith by the Board of Directors.

(v)     Record Date. If the Company takes a record of the holders of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issue or sale of the Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

(vi)     Floor Price. Until such time as the Company receives, the Stockholder Approval (as defined in the Securities Purchase Agreement), no adjustment pursuant to Section 7(a) shall cause the Conversion Price to be less than $23.05, as adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction (the "**Conversion Floor Price**").

(b)    Adjustment of Conversion Price upon Subdivision or Combination of Common Stock. If the Company at any time on or after the Subscription Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time on or after the Subscription Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased.

(c)    Other Events. If any event occurs of the type contemplated by the provisions of this Section 7 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Company's Board of Directors will make an appropriate adjustment in the Conversion Price so as to protect the rights of the Holder under this Note; provided that no such adjustment will increase the Conversion Price as otherwise determined pursuant to this Section 7.

(8)    HOLDER'S RIGHT OF OPTIONAL REDEMPTION. At any time during the thirty (30) day period commencing on the earlier of (i) the filing of the Company's Form 10-K for the fiscal year ending December 31, 2008, (the "2008 10-K") and (ii) the applicable date the Company is required to file the 2008 10-K as set forth in the Securities Exchange Act of 1934, as amended, the Holder shall have the right, in its sole discretion, to require that the Company redeem (each, a "Holder Optional Redemption") up to all of the Conversion Amount of this Note plus any accrued and unpaid Interest with respect to such Principal and Interest and any accrued and unpaid Late Charges, if any, with respect to such Principal and Interest (the "Available Holder Optional Redemption Amount") by delivering written notice thereof (a "Holder Optional Redemption Notice") to the Company. The Holder Optional Redemption Notice shall indicate the amount of the Available Holder Optional Redemption Amount the Holder is electing to have redeemed (the "Holder Optional Redemption Amount") and the date of such redemption (the "Holder Optional Redemption Date"); provided, however that such Holder Optional Redemption Date shall not be less than three (3) Business Days after the date of delivery of such Holder Optional Redemption Notice. The portion of this Note subject to redemption pursuant to this Section 8 shall be redeemed by the Company in cash on the Holder Optional Redemption Date at a price equal to the Holder Optional Redemption Amount being redeemed (the "Holder Optional Redemption Price"). Redemptions required by this Section 8 shall be made in accordance with the provisions of Section 12. Notwithstanding anything to the contrary in this Section 8, but subject to Section 3(d), until the Holder receives the Holder Optional Redemption Price, the Holder Optional Redemption Amount may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3, and any such conversion shall reduce the Holder Optional Redemption Amount in the manner set forth by the Holder in the applicable Conversion Notice. Notwithstanding the foregoing, from and after the filing of the 2008 10-K, if the Company's EBITDA for such fiscal year as set forth in the 2008 10-K exceeds $22,500,000, the Holder shall have no right to require redemption of this Note pursuant to this Section 8.

(9)    OPTIONAL REDEMPTION AT THE COMPANY'S ELECTION.

(a)    General. If at any time, and from time to time, from and after the second (2nd) anniversary of the Issuance Date (the **"Optional Redemption Eligibility Date"**), (i) the average Closing Sale Price of the Common Stock for any twenty (20) Trading Days out of any thirty (30) consecutive Trading Day period exceeds 175% of the Conversion Price then in effect following the Optional Redemption Eligibility Date (the **"Optional Redemption Condition"**) and (ii) there has been no Equity Conditions Failure, the Company shall have the right, provided the Optional Redemption Condition is also met on and as of the Optional Redemption Date, to redeem all or any portion of the Conversion Amount then remaining under this Note (the **"Optional Redemption Amount"**) as designated in the Optional Redemption Notice, as of the Optional Redemption Date (an **"Optional Redemption"**). The portion of this Note subject to redemption pursuant to this Section 9 shall be redeemed by the Company in cash at a price equal to the sum of (i) the Conversion Amount being redeemed, (B) the applicable Make-Whole Amount, (C) the amount of any accrued and unpaid Interest on such Conversion Amount through the Optional Redemption Date and (D) the amount of any accrued and unpaid Late Charges, if any, on such Conversion Amount and related Interest through the Optional Redemption Date (the **"Optional Redemption Price"**). The Company may exercise its right to require redemption under this Section 9 by delivering a written notice thereof by facsimile and overnight courier to all, but not less than all, of the holders of Notes (the **"Optional Redemption Notice"** and the date all of the holders received such notice is referred to as the **"Optional Redemption Notice Date"**) and each Optional Redemption Notice shall be irrevocable. The Optional Redemption Notice shall state (1) the date on which the Optional Redemption shall occur (the **"Optional Redemption Date"**) which date shall be not less than five (5) Trading Days nor more than thirty (30) Trading Days after the Optional Redemption Notice Date, and (2) the aggregate Conversion Amount of the Notes which the Company has elected to be subject to Optional Redemption from all of the holders of the Notes pursuant to this Section 9  (and analogous provisions under the Other Notes) on the Optional Redemption Date; provided, however, that the Company shall not redeem a Conversion Amount under this Section in excess of the Holder's Pro Rata Amount of the aggregate dollar trading volume (as reported on Bloomberg) of the Common Stock over the thirty (30) consecutive Trading Day period ending on the Trading Day immediately preceding the Optional Redemption Notice Date.   The Company may not effect more than one (1) Optional Redemption during any consecutive thirty (30) Trading Day period. Notwithstanding anything to the contrary in this Section 9, until the Optional Redemption Price is paid, in full, the Optional Redemption Amount may be converted, in whole or in part, by the Holders into shares of Common Stock pursuant to Section 3. All Conversion Amounts converted by the Holder after the Optional Redemption Notice Date shall reduce the Optional Redemption Amount of this Note required to be redeemed on the Optional Redemption Date. Redemptions made pursuant to this Section 9 shall be made in accordance with Section 12.

(b)    Pro Rata Redemption Requirement. If the Company elects to cause an Optional Redemption pursuant to Section 9(a), then it must simultaneously take the same action with respect to the Other Notes. If the Company elects to cause an Optional Redemption pursuant to Section 9(a) (or similar provisions under the Other Notes) with respect to less than all of the Conversion Amounts of the Notes then outstanding, then the Company shall require redemption of a Conversion Amount from each of the holders of the Notes equal to

the product of (i) the aggregate Conversion Amount of Notes which the Company has elected to cause to be redeemed pursuant to Section 9(a), multiplied by (ii) the fraction, the numerator of which is the sum of the aggregate initial principal amount of the Notes purchased by such holder of outstanding Notes and the denominator of which is the sum of the aggregate initial principal amount of the Notes purchased by all holders holding outstanding Notes (such fraction with respect to each holder is referred to as its **"Redemption Allocation Percentage"**, and such amount with respect to each holder is referred to as its **"Pro Rata Redemption Amount"**); provided, however that in the event that any holder's Pro Rata Redemption Amount exceeds the outstanding Principal amount of such holder's Note, then such excess Pro Rata Redemption Amount shall be allocated amongst the remaining holders of Notes in accordance with the foregoing formula.  In the event that the initial holder of any Notes shall sell or otherwise transfer any of such holder's Notes, the transferee shall be allocated a pro rata portion of such holder's Redemption Allocation Percentage and Pro Rata Redemption Amount.

(10)    NONCIRCUMVENTION.  The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(11)    RESERVATION OF AUTHORIZED SHARES.

(a)    Reservation.  The Company initially shall reserve out of its authorized and unissued Common Stock a number of shares of Common Stock for each of the Notes equal to 120% of the Conversion Rate with respect to the Conversion Amount of each such Note as of the Issuance Date. So long as any of the Notes are outstanding, the Company shall take all action necessary to reserve and keep available out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of the Notes, 120% of the number of shares of Common Stock as shall from time to time be necessary to effect the conversion of all of the Notes then outstanding; provided that at no time shall the number of shares of Common Stock so reserved be less than the number of shares required to be reserved of the previous sentence (without regard to any limitations on conversions) (the **"Required Reserve Amount"**). The initial number of shares of Common Stock reserved for conversions of the Notes and each increase in the number of shares so reserved shall be allocated pro rata among the holders of the Notes based on the principal amount of the Notes held by each holder at the Closing (as defined in the Securities Purchase Agreement) or increase in the number of reserved shares, as the case may be (the **"Authorized Share Allocation"**). In the event that a holder shall sell or otherwise transfer any of such holder's Notes, each transferee shall be allocated a pro rata portion of such holder's Authorized Share Allocation.  Any shares of Common Stock reserved and allocated to any Person which ceases to hold any Notes shall be allocated to the remaining holders of Notes, pro rata based on the principal amount of the Notes then held by such holders.

(b)    Insufficient Authorized Shares.  If at any time while any of the Notes remain outstanding the Company does not have a sufficient number of authorized and unreserved shares of Common Stock to satisfy its obligation to reserve for issuance upon conversion of the Notes at least a number of shares of Common Stock equal to the Required Reserve Amount (an "**Authorized Share Failure**"), then the Company shall immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the Required Reserve Amount for the Notes then outstanding.  Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than ninety (90) days after the occurrence of such Authorized Share Failure, the Company shall hold a meeting of its shareholders for the approval of an increase in the number of authorized shares of Common Stock.  In connection with such meeting, the Company shall provide each shareholder with a proxy statement and shall use its best efforts to solicit its shareholders' approval of such increase in authorized shares of Common Stock and to cause its board of directors to recommend to the shareholders that they approve such proposal.

(12)    HOLDER'S REDEMPTIONS.

(a)    Mechanics.  The Company shall deliver the applicable Event of Default Redemption Price to the Holder within five (5) Business Days after the Company's receipt of the Holder's Event of Default Redemption Notice.  If the Holder has submitted a Change of Control Redemption Notice in accordance with Section 5(b), the Company shall deliver the applicable Change of Control Redemption Price to the Holder concurrently with the consummation of such Change of Control if such notice is received prior to the consummation of such Change of Control and within five (5) Business Days after the Company's receipt of such notice otherwise.  The Company shall deliver the Holder Optional Redemption Price to the Holder on the Holder Optional Redemption Date and the Optional Redemption Price on the Holder Optional Redemption Date.  In the event of a redemption of less than all of the applicable Optional Redemption Amount of this Note, the Company shall promptly cause to be issued and delivered to the Holder a new Note (in accordance with Section 19(d)) representing the outstanding Principal which has not been redeemed.  In the event that the Company does not pay the applicable Redemption Price to the Holder within the time period required, at any time thereafter and until the Company pays such unpaid Redemption Price in full, the Holder shall have the option, in lieu of redemption, to require the Company to promptly return to the Holder all or any portion of this Note representing the Conversion Amount that was submitted for redemption and for which the applicable Redemption Price (together with any Late Charges thereon) has not been paid.  Upon the Company's receipt of such notice, (x) the Redemption Notice shall be null and void with respect to such Conversion Amount, (y) the Company shall immediately return this Note, or issue a new Note (in accordance with Section 19(d)) to the Holder representing such Conversion Amount and (z) the Conversion Price of this Note or such new Notes shall be adjusted to the lesser of (A) the Conversion Price as in effect on the date on which the Redemption Notice is voided and (B) the lowest Closing Bid Price during the period beginning on and including the date on which the Redemption Notice is delivered to the Company and ending on and including the date on which the Redemption Notice is voided.  The Holder's delivery of a notice voiding a Redemption Notice and exercise of its rights following such notice shall not affect the Company's obligations to make any payments of Late Charges which have

accrued prior to the date of such notice with respect to the Conversion Amount subject to such notice.

(b)     Redemption by Other Holders.  Upon the Company's receipt of notice from any of the holders of the Other Notes for redemption or repayment as a result of an event or occurrence substantially similar to the events or occurrences described in Section 4(b), Section 5(b) or Section 8 (each, an **"Other Redemption Notice"**), the Company shall immediately, but no later than one (1) Business Day of its receipt thereof), forward to the Holder by facsimile a copy of such notice.  If the Company receives a Redemption Notice and one or more Other Redemption Notices, during the seven (7) Business Day period beginning on and including the date which is three (3) Business Days prior to the Company's receipt of the Holder's Redemption Notice and ending on and including the date which is three Business Days after the Company's receipt of the Holder's Redemption Notice and the Company is unable to redeem all principal, interest and other amounts designated in such Redemption Notice and such Other Redemption Notices received during such seven (7) Business Day period, then the Company shall redeem a pro rata amount from each holder of the Notes (including the Holder) based on the principal amount of the Notes submitted for redemption pursuant to such Redemption Notice and such Other Redemption Notices received by the Company during such seven (7) Business Day period.

(13)     RESTRICTION ON REDEMPTION AND CASH DIVIDENDS.  Until all of the Notes have been converted, redeemed or otherwise satisfied in accordance with their terms, the Company shall not, directly or indirectly, redeem, repurchase or declare or pay any cash dividend or distribution on its capital stock without the prior express written consent of the Required Holders.

(14)     VOTING RIGHTS.  The Holder shall have no voting rights as the holder of this Note, except as required by law, including but not limited to the Delaware General Corporation Law, and as expressly provided in this Note.

(15)     COVENANTS.

(a)     Rank.  All payments due under this Note (a) shall rank *pari passu* with all Other Notes and (b) shall be senior to all other Indebtedness of the Company and its Subsidiaries other than Permitted Senior Indebtedness.

(b)     Indebtedness.  So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness.

(c)     Existence of Liens.  So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, allow or suffer to exist any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by the Company or any of its Subsidiaries (collectively, **"Liens"**) other than Permitted Liens.

(d)     Restricted Payments.  The Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, redeem, defease, repurchase,

repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Permitted Indebtedness, whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness if at the time such payment is due or is otherwise made or, after giving effect to such payment, an event constituting, or that with the passage of time and without being cured would constitute, an Event of Default has occurred and is continuing.

(16)    RIGHTS UPON DISTRIBUTION OF ASSETS. Subject to the provisions of Section 4(j) of the Securities Purchase Agreement, if the Company shall declare or make any dividend (or other distribution of its assets (or rights to acquire its assets) to holders of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, shares or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a **"Distribution"**), at any time after the issuance of this Note, then, in each such case any Conversion Price in effect immediately prior to the close of business on the record date fixed for the determination of holders of Common Stock entitled to receive the Distribution shall be reduced, effective as of the close of business on such record date, to a price determined by multiplying such Conversion Price by a fraction of which (i) the numerator shall be the Closing Bid Price of the Common Stock on the Trading Day immediately preceding such record date minus the value of the Distribution (as determined in good faith by the Company's Board of Directors) applicable to one share of Common Stock, and (ii) the denominator shall be the Closing Bid Price of the Common Stock on the Trading Day immediately preceding such record date.

(17)    VOTE TO ISSUE, OR CHANGE THE TERMS OF, NOTES. No term of this Note may be amended or modified unless pursuant to a writing signed by the Company and the Required Holders. The affirmative vote at a meeting duly called for such purpose or the written consent without a meeting of the Required Holders shall be required for any change or amendment to this Note or the Other Notes.

(18)    TRANSFER. This Note may be offered, sold, assigned or transferred by the Holder without the consent of the Company, subject only to the provisions of Section 2(f) of the Securities Purchase Agreement; provided, however, that no such sale, assignment or transfer of this Note shall be in a denomination less than the lesser of (a) $500,000 and (b) the remaining outstanding Principal of this Note, the accrued and unpaid Interest with respect to such Principal and the accrued and unpaid Late Charges with respect to such Principal and Interest;.

(19)    REISSUANCE OF THIS NOTE.

(a)    Transfer. If this Note is to be transferred, the Holder shall surrender this Note to the Company, whereupon the Company will, subject to the satisfaction of the transfer provisions of the Securities Purchase Agreement, forthwith issue and deliver upon the order of the Holder a new Note (in accordance with Section 19(d)), registered in the name of the registered transferee or assignee, representing the outstanding Principal being transferred by the Holder and, if less then the entire outstanding Principal is being transferred, a new Note (in accordance with Section 19(d) to the Holder representing the outstanding Principal not being

transferred. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of Section 3(c)(iii) and this Section 19(a), following conversion or redemption of any portion of this Note, the outstanding Principal represented by this Note may be less than the Principal stated on the face of this Note.

(b) <u>Lost, Stolen or Mutilated Note</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 19(d)) representing the outstanding Principal.

(c) <u>Note Exchangeable for Different Denominations</u>. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 19(d) and in principal amounts of at least $100,000) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) <u>Issuance of New Notes</u>. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 19(a) or Section 19(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest and Late Charges on the Principal and Interest of this Note, from the Issuance Date.

(20) <u>REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(21)    PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(22)    CONSTRUCTION; HEADINGS. This Note shall be deemed to be jointly drafted by the Company and all the Purchasers and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(23)    FAILURE OR INDULGENCE NOT WAIVER. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(24)    DISPUTE RESOLUTION. In the case of a dispute as to the determination of the Closing Bid Price, the Closing Sale Price or the Weighted Average Price or the arithmetic calculation of the Conversion Rate or any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile within two (2) Business Days of receipt, or deemed receipt, of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation within two (2) Business Days of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within two (2) Business Days submit via facsimile (a) the disputed determination of the Closing Bid Price, the Closing Sale Price or the Weighted Average Price to an independent, reputable investment bank selected by the Company and approved by the Holder or (b) the disputed arithmetic calculation of the Conversion Rate or any Redemption Price to the Company's independent, outside accountant. The Company, at the Company's expense, shall cause the investment bank or the accountant, as the case may be, to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such investment bank's or accountant's determination or calculation, as the case may be, shall be binding upon all parties absent demonstrable error.

(25)    NOTICES; PAYMENTS.

(a)    Notices. Whenever notice is required to be given under this Note, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Note, including in reasonable detail a description of such action and the reason therefore. Without limiting the generality of the foregoing, the Company will give written notice to the Holder (i) immediately upon any adjustment of the

10089644.2                                    - 21 -

Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least twenty (20) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

(b)    Payments.  Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing (which address, in the case of each of the Purchasers, shall initially be as set forth on the Schedule of Buyers attached to the Securities Purchase Agreement); provided that the Holder may elect to receive a payment of cash via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day and, in the case of any Interest Date which is not the date on which this Note is paid in full, the same shall instead be due on the next succeeding day which is a Business Day. Any amount of Principal or other amounts due under the Transaction Documents, other than Interest, which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate of twelve and one-half percent (12.5%) per annum from the date such amount was due until the same is paid in full ("**Late Charge**").

(26)    CANCELLATION.    After all Principal, accrued Interest and other amounts at any time owed on this Note has been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(27)    WAIVER OF NOTICE.  To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and the Securities Purchase Agreement.

(28)    GOVERNING LAW; JURISDICTION; JURY TRIAL.  This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. The Company hereby irrevocably waives personal service of process

and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address it set forth on the signature page hereto and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(29)     SUBORDINATION TO PERMITTED INDEBTEDNESS.

(a)     Subordination. The indebtedness represented by this Note and the payment of any Principal, Interest, Late Charges, redemption amount, liquidated damages, fees, expenses or any other amounts in respect of this Note (collectively, the "**Subordinated Indebtedness**") is hereby expressly made subordinate and junior and subject in all respects to the right of payment and to the prior payment in full of all Permitted Senior Indebtedness of the Company hereinafter incurred.

(b)     Payment upon Dissolution, Etc. In the event of any bankruptcy, insolvency, reorganization, receivership, composition, assignment for benefit of creditors or other similar proceeding initiated by or against the Company, or any dissolution or winding up or total or partial liquidation or reorganization in bankruptcy of the Company (each, a "**Proceeding**"), all principal, interest and other obligations due upon any Permitted Senior Indebtedness shall first be paid or collateralized in full in cash (or cash equivalents) before the Holder shall be entitled to receive or, if received, to retain any payment or distribution of any Subordinated Indebtedness and, during the continuance of any such Proceeding, any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to which the Holder would be entitled with respect to any Subordinated Indebtedness but for the provisions of this Section 29 shall be paid by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other Person making such payment or distribution, or by the Holder who shall have received such payment or distribution, directly to the holders of the Permitted Senior Indebtedness (pro rata to each such holder on the basis of the respective amounts of such Permitted Senior Indebtedness held by such holder) or their representatives to the extent necessary to pay (or collaterize in cash) all such Permitted Senior Indebtedness in full after giving effect to any concurrent payment or distribution to or for the holders of such Permitted Senior Indebtedness, before any payment or distribution of any of the Subordinated Indebtedness is made to (or retained by) the Holder or any other holders of any of the Notes.

(c)    Certain Rights.  Nothing contained in this Section 29 or elsewhere in this Note or any other Transaction Document, is intended to or shall impair, as among the Company, its creditors including the holders of Permitted Senior Indebtedness and the Holder, the right, which is absolute and unconditional, of the Holder to convert this Note in accordance herewith.

(d)    Rights of Holder Unimpaired.   The provisions of this Section 29 are and are intended solely for the purposes of defining the relative rights of the Holder and the holders of Permitted Senior Indebtedness and nothing in this Section 29 shall impair, as between the Company and the Holder, the obligation of the Company, which is unconditional and absolute, to pay to the Holder the Principal hereof (and premium, if any), accrued Interest hereon and all other Subordinated Indebtedness payable hereunder, all in accordance with the terms of this Note.

(30)    CERTAIN DEFINITIONS.  For purposes of this Note, the following terms shall have the following meanings:

(a)    "Approved Stock Plan" means any employee benefit plan or long term stock incentive plan which has been approved by the Board of Directors of the Company, pursuant to which the Company's securities may be issued to any employee, consultant, officer or director for services provided to the Company.

(b)    "Bloomberg" means Bloomberg Financial Markets.

(c)    "Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(d)    "Calendar Quarter" means each of: the period beginning on and including January 1 and ending on and including March 31; the period beginning on and including April 1 and ending on and including June 30; the period beginning on and including July 1 and ending on and including September 30; and the period beginning on and including October 1 and ending on and including December 31.

(e)    "Change of Control" means any Fundamental Transaction other than (i) any reorganization, recapitalization or reclassification of the Common Stock in which holders of the Company's voting power immediately prior to such reorganization, recapitalization or reclassification continue after such reorganization, recapitalization or reclassification to hold publicly traded securities and, directly or indirectly, the voting power of the surviving entity or entities necessary to elect a majority of the members of the board of directors (or their equivalent if other than a corporation) of such entity or entities, or (ii) pursuant to a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of the Company.

(f)    "Change of Control Consideration" means, for any Change of Control, an amount equal to the sum of the aggregate cash consideration and the aggregate cash value of any marketable securities per share of Common Stock to be paid to the holders of the Common Stock upon consummation of such Change of Control, with any such marketable

securities to be valued at the Closing Sale Price of such securities as of the Trading Day following the public announcement of such proposed Change of Control.

(g)    **"Change of Control Redemption Premium"** means (i) for Change of Control events consummated prior to the third (3rd) anniversary of the Issuance Date, 120% and (ii) for Change of Control events consummated following the third (3rd) anniversary of the Issuance Date, 110%; provided, however, that, in connection with any Change of Control in which the Change of Control Consideration (A) consists solely of cash, marketable securities or a combination thereof and (B) equals or exceeds 150% of the initial Conversion Price, then the Change of Control Redemption Premium shall equal 100%.

(h)    **"Closing Bid Price"** and **"Closing Sale Price"** means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the "pink sheets" by Pink Sheets LLC (formerly the National Quotation Bureau, Inc.). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 24. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during the applicable calculation period.

(i)    **"Closing Date"** shall have the meaning set forth in the Securities Purchase Agreement, which date is the date the Company initially issued Notes pursuant to the terms of the Securities Purchase Agreement.

(j)    **"Common Stock Deemed Outstanding"** means, at any given time, the number of shares of Common Stock actually outstanding at such time, plus the number of shares of Common Stock deemed to be outstanding pursuant to Sections 7(a)(i) and 7(a)(ii) hereof regardless of whether the Options or Convertible Securities are actually exercisable at such time, but excluding any Common Stock owned or held by or for the account of the Company or issuable upon conversion or exercise, as applicable, of the Notes and the Warrants.

(k)    **"Consolidated EBITDA"** means, with respect to any Person for any applicable Calendar Quarters, the Consolidated Net Income of such Person and its

10089644.2                                     - 25 -

Subsidiaries as set forth in the financial statements of the Company contained in the Form 10-Q or Form 10-K for the most recent Calendar Quarters for which financials are publicly available, plus without duplication, the sum of the following amounts of such Person and its Subsidiaries for such period and to the extent deducted in determining Consolidated Net Income of such Person for such period: (i) Consolidated Net Interest Expense, (ii) income tax expense, (iii) depreciation expense, (iv) amortization expense, and (v) any non-cash impact of hedge or derivative accounting adjustments.

(l)    **"Consolidated Net Income"** means, with respect to any Person for any period, the net income (loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis and in accordance with GAAP, but excluding from the determination of Consolidated Net Income (without duplication) (i) any extraordinary or non recurring gains or losses or gains or losses from dispositions of assets, (ii) restructuring charges, (iii) any tax refunds, net operating losses or other net tax benefits, (iv) effects of discontinued operations and (v) interest income (including interest paid-in-kind)

(m)    **"Consolidated Net Interest Expense"** means, with respect to any Person for any period, gross interest expense of such Person and its Subsidiaries for such period determined on a consolidated basis and in accordance with GAAP (including, without limitation, interest expense paid to affiliates of such Person), less (i) the sum of (A) interest income for such period and (B) gains for such period on hedging agreements (to the extent not included in interest income above and to the extent not deducted in the calculation of gross interest expense), plus (ii) the sum of (A) losses for such period on hedging agreements (to the extent not included in gross interest expense) and (B) the upfront costs or fees for such period associated with hedging agreements (to the extent not included in gross interest expense), in each case, determined on a consolidated basis and in accordance with GAAP.

(n)    **"Contingent Obligation"** means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

(o)    **"Convertible Securities"** means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for Common Stock.

(p)    **"EBITDA Target"** means, from and after the Effective Date, the Company has reported LTM Consolidated EBITDA from or after the Calendar Quarter ended March 31, 2006 equal to or greater than $4,000,000.

(q)    **"EBITDA Test"** means that (i) the Equity Conditions have been satisfied as of the applicable date of determination and (ii) the Company has either (A) for the Calendar Quarter ended March 31, 2006, for the two (2) consecutive Calendar Quarters ended June 30, 2006 and for the three (3) consecutive Calendar Quarters ended September 30, 2006,