discussed herein and therein, and this Agreement, the other Transaction Documents and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor any Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be amended other than by an instrument in writing signed by the Company and the holders of at least a majority of the aggregate principal amount of Notes issued and issuable hereunder, and any amendment to this Agreement made in conformity with the provisions of this Section 9(e) shall be binding on all Buyers and holders of Securities, as applicable. No provision hereof may be waived other than by an instrument in writing signed by the party against whom enforcement is sought. No such amendment shall be effective to the extent that it applies to less than all of the holders of the applicable Securities then outstanding. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration also is offered to all of the parties to the Transaction Documents, holders of Notes or holders of the Warrants, as the case may be. The Company has not, directly or indirectly, made any agreements with any Buyers relating to the terms or conditions of the transactions contemplated by the Transaction Documents except as set forth in the Transaction Documents. Without limiting the foregoing, the Company confirms that, except as set forth in this Agreement, no Buyer has made any commitment or promise or has any other obligation to provide any financing to the Company or otherwise.

(f)     Notices. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one Business Day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company:

> The Allied Defense Group, Inc.
> 8000 Towers Crescent Drive
> Suite 260
> Vienna, Virginia 22182
> Telephone:     (703) 847-5268
> Facsimile:
> Attention:

With a copy (for informational purposes only) to:

> Baxter, Baker, Sidle, Conn & Jones
> Sun Trust Building
> Suite 2100
> 120 E. Baltimore Street
> Baltimore, Maryland 21202
> Tel: (410) 230-8122

Fax: (410) 230-3801
Attention: James E. Baker, Jr., Esq.

If to the Transfer Agent:

Mellon Investor Services, LLC
85 Challenger Road
Ridgefield, New Jersey 07660

If to a Buyer, to its address and facsimile number set forth on the Schedule of Buyers, with copies to such Buyer's representatives as set forth on the Schedule of Buyers,

with a copy (for informational purposes only) to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Telephone:    (212) 756-2000
Facsimile:    (212) 593-5955
Attention:    Eleazer N. Klein, Esq.

or to such other address and/or facsimile number and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

(g)    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, including any purchasers of the Notes or the Warrants. The Company shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of the holders of at least a majority of the aggregate principal amount of Notes issued and issuable hereunder, including by way of a Fundamental Transaction (unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Notes and the Warrants). A Buyer may assign some or all of its rights hereunder without the consent of the Company in which event such assignee shall be deemed to be a Buyer hereunder with respect to such assigned rights.

(h)    No Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

(i)    Survival. Unless this Agreement is terminated under Section 8, the representations and warranties of the Company and the Buyers contained in Sections 2 and 3 and the agreements and covenants set forth in Sections 4, 5 and 9 shall survive the Closing. Each

Buyer shall be responsible only for its own representations, warranties, agreements and covenants hereunder.

(j)    <u>Further Assurances</u>. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k)    <u>Indemnification</u>. In consideration of each Buyer's execution and delivery of the Transaction Documents and acquiring the Securities thereunder and in addition to all of the Company's other obligations under the Transaction Documents, the Company shall defend, protect, indemnify and hold harmless each Buyer and each other holder of the Securities and all of their shareholders, partners, members, officers, directors, employees and direct or indirect investors and any of the foregoing Persons' agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "**Indemnitees**") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "**Indemnified Liabilities**"), incurred by any Indemnitee as a result of, or arising out of, or relating to (a) any inaccuracy in any representation or warranty made by the Company in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby or (c) any cause of action, suit or claim brought or made against such Indemnitee by a third party (including for these purposes a derivative action brought on behalf of the Company) and arising out of or resulting from (i) the execution, delivery, performance or enforcement of the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (ii) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Securities, (iii) any disclosure made by such Buyer pursuant to Section 4(i), or (iv) the status of such Buyer or holder of the Securities as an investor in the Company pursuant to the transactions contemplated by the Transaction Documents. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities that is permissible under applicable law. Except as otherwise set forth herein, the mechanics and procedures with respect to the rights and obligations under this Section 9(k) shall be the same as those set forth in Section 6 of the Registration Rights Agreement.

(l)    <u>No Strict Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(m)    <u>Remedies</u>. Each Buyer and each holder of the Securities shall have all rights and remedies set forth in the Transaction Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the

rights which such holders have under any law. Any Person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. Furthermore, the Company recognizes that in the event that it fails to perform, observe, or discharge any or all of its obligations under the Transaction Documents, any remedy at law may prove to be inadequate relief to the Buyers. The Company therefore agrees that the Buyers shall be entitled to seek temporary and permanent injunctive relief in any such case without the necessity of proving actual damages and without posting a bond or other security.

(n)     Rescission and Withdrawal Right.     Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) the Transaction Documents, whenever any Buyer exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then such Buyer may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company, any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights.

(o)     Payment Set Aside.     To the extent that the Company makes a payment or payments to the Buyers hereunder or pursuant to any of the other Transaction Documents or the Buyers enforce or exercise their rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, federal or state, foreign law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

(p)     Independent Nature of Buyers' Obligations and Rights.     The obligations of each Buyer under any Transaction Document are several and not joint with the obligations of any other Buyer, and no Buyer shall be responsible in any way for the performance of the obligations of any other Buyer under any Transaction Document. Nothing contained herein or in any other Transaction Document, and no action taken by any Buyer pursuant hereto or thereto, shall be deemed to constitute the Buyers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Buyers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents and the Company acknowledges that the Buyers are not acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. Each Buyer confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors. Each Buyer shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement or out of any other Transaction Documents, and it shall not be necessary for any other Buyer to be joined as an additional party in any proceeding for such purpose.

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

**COMPANY:**

**THE ALLIED DEFENSE GROUP, INC.**

By: _____
Name: John J. Marcello
Title: President and CEO

[Signature Page to Securities Purchase Agreement]

IN WITNESS WHEREOF, each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

BUYERS:

**KINGS ROAD INVESTMENTS LTD.**

By: _____

Name: *Brandon L. Jones*

Title: *Authorized Signatory*

**IN WITNESS WHEREOF,** each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

**BUYERS:**

**PORTSIDE GROWTH & OPPORTUNITY FUND**

By: _____

Name: JEFFREY C. SMITH

Title: AUTHORIZED SIGNATORY

[Signature Page to Securities Purchase Agreement]

**IN WITNESS WHEREOF,** each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

**BUYERS:**

**CASTLERIGG MASTER INVESTMENTS LTD.**
**BY: SANDELL ASSET MANAGEMENT CORP.**

By: _____

    Name:  Patrick T. Burke
    Title:   Senior Managing Director

[Signature Page to Securities Purchase Agreement]

IN WITNESS WHEREOF, each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

**BUYERS:**

**LB I GROUP INC.**

By: _____
Name: HENRY KLEIN
Title: M.D

[Signature Page to Securities Purchase Agreement]

## SCHEDULE OF BUYERS

| (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|
| Buyer | Address and Facsimile Number | Aggregate Principal Amount of Notes | Number of Warrant Shares | Purchase Price | Legal Representative's Address and Facsimile Number |
| Kings Road Investments Ltd. | c/o Polygon Investment Partners LP 598 Madison Avenue, 14th Floor New York, NY 10022 Attention: Erik M.W. Caspersen and Brandon L. Jones Facsimile: (212) 359-7303 Telephone: (212) 359-7300 Residence: Cayman Islands | $12,500,000 | 94,500 | $12,500,000 | Schulte Roth & Zabel LLP 919 Third Avenue New York, New York 10022 Attention: Eleazer Klein, Esq. Facsimile: (212) 593-5955 Telephone: (212) 756-2376 |
| Portside Growth & Opportunity Fund | c/o Ramius Capital Group, L.L.C. 666 Third Avenue, 26th Floor New York, New York 10017 Attention: Jeffrey Smith Owen Littman Facsimile: (212) 845-7999 (212) 845-7995 Telephone: (212) 845-7955 (212) 201-4841 Residence: Cayman Islands | $7,500,000 | 56,700 | $7,500,000 | |
| Castlerigg Master Investments Ltd. | c/o Sandell Asset Management 40 West 57th St 26th Floor New York, NY 10019 Attention: Cem Hacioglu / Matthew Pliskin Telephone: 212-603-5700 Fax: 212-603-5710 Residence: British Virgin Islands | $6,000,000 | 45,360 | $6,000,000 | |

**LB I Group Inc.**

c/o Lehman Brothers Inc.
Att: Will Yelsits
399 Park Ave
NY, NY 10022

$4,000,000    30,240    $4,000,000

[Signature Page to Securities Purchase Agreement]

10074411.8

# EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Notes |
| Exhibit B | Form of Warrants |
| Exhibit C | Registration Rights Agreement |
| Exhibit D | Irrevocable Transfer Agent Instructions |
| Exhibit E | Form of Counsel Opinion |
| Exhibit F | Form of Secretary's Certificate |
| Exhibit G | Form of Officer's Certificate |

# SCHEDULES

| | |
|---|---|
| Schedule 3(a) | Subsidiaries |
| Schedule 3(l) | Absence of Certain Changes |
| Schedule 3(r) | Capitalization |
| Schedule 3(s) | Indebtedness and Other Contracts |
| Schedule 3(t) | Litigation |
| Schedule 3(x) | Intellectual Property |
| Schedule 3(z) | Subsidiary Rights |

# SCHEDULES TO SECURITIES
# PURCHASE AGREEMENT
# DATED AS OF
# MARCH 9, 2006

---

Capitalized terms not defined in these schedules shall have the meanings ascribed to them by the Securities Purchase Agreement dated as of March 9, 2006.

SCHEDULE 3(a)

1.    ARC Europe, S.A.

Wholly-owned and majority owned Belgian subsidiaries of ARC Europe S.A.

A.    Mecar S.A.

B.    Sedachim S.I.

C.    VSK Electronics N.V.

(1)    Belgian Automation Units, N.V.

(2)    Intelligent Data Capturing Systems, N.V.

(3)    Vigitec S.A.

(4)    Tele Technique Genarale, S.A.

D.    Hendrickx N.V.

2.    Allied Research Corporation Limited

3.    Energa Corporation

4.    News/Sports Microwave Rental, Inc.

5.    Titan Dynamics Systems, Inc.

6.    SeaSpace Corporation

7.    MECAR USA, Inc.

8.    Allied Technology, LLC

9.    Global Microwave Systems, Inc.

10.    Control Monitor Systems, Inc.

## SCHEDULE 3(e)

## CONSENTS

AMEX approval of Additional Listing Application
[Application Will Be Filed Promptly Following Closing]

SEC Declaration of Effectiveness of Registration Statement
[To Be Obtained As Set Forth in Registration Rights Agreement]

Approval of Stockholders of the Company
[To Be Obtained As Set Forth in Securities Purchase Agreement]

## SCHEDULE 3(j)

## SHAREHOLDERS' RIGHTS PLAN

The Company has a fifteen percent (15%) Shareholder's Rights Plan as further described in the Company's Form 8-K filed with the SEC on June 25, 2001.

SCHEDULE 3(k)

SEC DOCUMENTS

As set forth in the SEC Documents, (i) in early 2005, the Company announced that it had determined to restate its 2002 – 2004 financial statements and a Form 10-K once filed on March 31, 2005;  (ii) in mid-2005, the Company announced that it has determined to once again restate its 2002 – 2004 financial statements and a Form 10-K/A was subsequently filed with the SEC on October 5, 2005;  and (iii) in early November 2005, the Company announced that it had determined to restate its financial statements for the first and second quarters of 2005.

The Company is currently reviewing with its current and former independent auditors the possibility of a further restatement of 2002 – 2004 financial statements.  It is expected that a final decision will be made prior to March 31, 2006.

## SCHEDULE 3(l)

## MATERIAL ADVERSE DEVELOPMENTS

The Company has experienced a cash shortage which has required the Company to obtain the Bridge Financing as defined on Schedule 3(s).

The Company expects to report a substantial loss in 2005.

Patriot Capital, the Company's senior lender, has declared an Event of Default under the Senior Loan Facility as set forth on the Company's Form 8-K filed February 13, 2006.

The Company is currently reviewing with its current and former independent auditors the possibility of a further restatement of 2002 – 2004 financial statements. It is expected that a final decision will be made prior to March 31, 2006.

SCHEDULE 3(m)

UNDISCLOSED EVENTS

The Company is currently reviewing with its current and former independent auditors the possibility of a further restatement of 2002 – 2004 financial statements. It is expected that a final decision will be made prior to March 31, 2006.

The Company expects to report a substantial loss in 2005.

SCHEDULE 3(n)

AMEX MATTERS

In early December 2005, the Company received a "warning letter" from AMEX due to its failure to obtain AMEX approval prior to issuance of shares of the Company's common stock in an acquisition. See the Company's Form 8-K filed with the SEC on December 9, 2005. The Company subsequently filed the necessary additional listing application and obtained AMEX approval.

## SCHEDULE 3(r)

## EQUITY MATTERS

Outstanding stock options:

| | |
|---|---|
| Peay | 206,500 |
| Pickens | 80,000 |
| Dowski | 80,000 |
| Hoskins | 40,000 |
| Griffith | 19,500 |
| Sculley | 13,000 |
| Warner | 13,000 |
| Decker | 13,000 |
| Christ | 13,000 |
| | 478,000 |

Shares of Series B Participating Preferred Stock (Shareholders Rights Plan)

Warrants for 28,000 shares issued to Patriot Capital

Warrants for 15,000 shares issued to Riverview Group, LLC *

See Schedule 3(s) re Indebtedness

Stock grants up to 2,000 shares may be issued in connection with the Bridge Financing.

---

\* Contains weighted average anti-dilution provisions which will be triggered by the issuance of the Securities. This will reduce the exercise price and also result in an increase in the number of shares exercisable under the warrant such that the aggregate exercise price after adjustment shall equal the aggregate exercise price prior to adjustment.

<u>SCHEDULE 3(s)</u>

<u>INDEBTEDNESS</u>

$14,000,000 Loan Payable to Patriot Capital (See Form 8-K filed June 2, 2004). This Loan is to be repaid at closing.

$1,750,000 Loan Payable to Robert P. Dowski ("Bridge Financing") * (See Form 8-K filed on February 13, 2006).

Approximately $4,625,000 (as of December 31, 2005) of Aggregate Loans Payable With Respect To Vehicle, Equipment and Capital Lease Obligations (See Footnote K to Form 10-K/A filed October 5, 2005).

MECAR's obligations under the bank pool/syndicate agreement are collateralized by a first lien on all of its assets, including a pledge of certain amounts of cash (See Form 10-K/A filed October 5, 2005). The bank pool/syndicate agreement provides a revolver of approximately $14 million and a facility for letters of credit/advance payment guarantees of approximately $28 million.

MECAR is also obligated pursuant to outstanding letters of credit issued for the benefit of its vendors and hedge contracts entered into in the ordinary course of its business (See Form 10-K/A filed October 5, 2005).

VSK is obligated under a small loan in connection with its acquisition of Control Monitor Systems, Inc. (See Footnote K to Form 10-K/A filed October 5, 2005).

$11,011,083 term loan payable to the order of Sam Nasirri.

Up to $4,000,000 earn out payable to Sam Nasirri.

Up to $550,000 working capital adjustment payable to Sam Nasirri.

---

* May be increased up to $2,000,000

## SCHEDULE 3(v)

## EMPLOYEE RELATIONS

Certain of MECAR's employees are unionized under Belgian law.

## SCHEDULE 3(w)

## TITLE

The assets of the Company and its domestic subsidiaries have been pledged to support the Patriot Capital loan.

MECAR's assets have been pledged to support its bank pool/syndicate obligations.

## SCHEDULE 3(x)

## INTELLECTUAL PROPERTY RIGHTS

     The former president of Titan Dynamics Systems, Inc. has made a number of claims against the Company and Titan including a claim for transfer of certain Titan patents to such individual. The Company disputes all such claims and intends to vigorously defend any legal action initiated by such individual.

## SCHEDULE 3(z)

## SUBSIDIARY RIGHTS

MECAR's bank pool/syndicate agreement sets forth certain restrictions on the Company's ability to obtain dividends and other distributions from MECAR.

## SCHEDULE 3(cc)

## SENIOR INDEBTEDNESS

Except for the Patriot Capital loan (which will be retired at closing), no other Company loan is senior to the Notes.

EXHIBIT C

## REGISTRATION RIGHTS AGREEMENT

**REGISTRATION RIGHTS AGREEMENT** (this "**Agreement**"), dated as of March 9, 2006, by and among The Allied Defense Group, Inc., a Delaware corporation, with headquarters located at 8000 Towers Crescent Drive, Suite 260, Vienna, Virginia 22182 (the "**Company**"), and the undersigned buyers (each, a "**Buyer**", and collectively, the "**Buyers**").

### WHEREAS:

A.    In connection with the Securities Purchase Agreement by and among the parties hereto of even date herewith (the "**Securities Purchase Agreement**"), the Company has agreed, upon the terms and subject to the conditions set forth in the Securities Purchase Agreement, to issue and sell to each Buyer (i) senior subordinated convertible notes of the Company (the "**Notes**") which will, among other things, be convertible and/or redeemable into shares of the Company's common stock, $0.10 par value per share (the "**Common Stock**") (as converted and/or redeemed, the "**Conversion Shares**") in accordance with the terms of the Notes, and (ii) warrants (the "**Warrants**") which will be exercisable to purchase shares of Common Stock (as exercised collectively, the "**Warrant Shares**").

B.    To induce the Buyers to execute and deliver the Securities Purchase Agreement, the Company has agreed to provide certain registration rights under the Securities Act of 1933, as amended, and the rules and regulations thereunder, or any similar successor statute (collectively, the "**1933 Act**"), and applicable state securities laws.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each of the Buyers hereby agree as follows:

1.    Definitions.

Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Securities Purchase Agreement.  As used in this Agreement, the following terms shall have the following meanings:

a.    "**Business Day**" means any day other than Saturday, Sunday or any other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

b.    "**Closing Date**" shall have the meaning set forth in the Securities Purchase Agreement.

c.    "**Effective Date**" means the date a Registration Statement has been declared effective by the SEC.

d.    "**Effectiveness Deadline**" means the date which is 60 days after the earlier of the Filing Date and the Filing Deadline, or if there is a full review of the Registration Statement by the SEC, 120 days after the earlier of the Filing Date and the Filing Deadline.

10074678.5

e. **"Filing Date"** means the date the Registration Statement has been filed with the SEC.

f. **"Filing Deadline"** means the earlier of (i) September 30, 2006 and (ii) 45 days after the Company files its annual report on Form 10-K for the year ended December 31, 2005.

g. **"Investor"** means a Buyer or any transferee or assignee thereof to whom a Buyer assigns its rights under this Agreement in accordance with the requirements of the Transaction Documents and who agrees to become bound by the provisions of this Agreement in accordance with Section 9 and any transferee or assignee thereof to whom a transferee or assignee assigns its rights under this Agreement in accordance with the requirements of the Transaction Documents and who agrees to become bound by the provisions of this Agreement in accordance with Section 9.

h. **"Person"** means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization and a government or any department or agency thereof.

i. **"register,"** **"registered,"** and **"registration"** refer to a registration effected by preparing and filing one or more Registration Statements (as defined below) in compliance with the 1933 Act and pursuant to Rule 415 and the declaration or ordering of effectiveness of such Registration Statement(s) by the SEC.

j. **"Registrable Securities"** means (i) the Conversion Shares issued or issuable upon conversion and/or redemption of the Notes, (ii) the Warrant Shares issued or issuable upon exercise of the Warrants and (ii) any capital stock of the Company issued or issuable with respect to the Conversion Shares, the Notes, the Warrant Shares and the Warrants as a result of any stock split, stock dividend, recapitalization, exchange or similar event or otherwise, without regard to any limitations on conversions or redemptions of the Notes or exercises of the Warrants.

k. **"Registration Statement"** means a registration statement or registration statements of the Company filed under the 1933 Act covering the Registrable Securities.

l. **"Required Holders"** means the holders of at least a majority of the Registrable Securities.

m. **"Required Registration Amount"** means 120% of the sum of (x) the number of Conversion Shares issued and issuable pursuant to the Notes as of the trading day immediately preceding the applicable date of determination and (y) the number of Warrant Shares issued and issuable pursuant to the Warrants as of the trading day immediately preceding the applicable date of determination, subject to adjustment as provided in Section 2(e), without regard to any limitations on conversions or redemptions of the Notes or exercises of the Warrants.

10074678.5

n. "**Rule 415**" means Rule 415 under the 1933 Act or any successor rule providing for offering securities on a continuous or delayed basis.

o. "**SEC**" means the United States Securities and Exchange Commission.

2. Registration.

a. Mandatory Registration. The Company shall prepare, and, as soon as practicable but in no event later than the Filing Deadline, file with the SEC the Registration Statement on Form S-3 covering the resale of all of the Registrable Securities. In the event that Form S-3 is unavailable for such a registration, the Company shall use such other form as is available for such a registration on another appropriate form reasonably acceptable to the Required Holders, subject to the provisions of Section 2(d). The Registration Statement prepared pursuant hereto shall register for resale at least that number of shares of Common Stock equal to the Required Registration Amount determined as of the date such Registration Statement is initially filed with the SEC. The Registration Statement shall contain (except if otherwise directed by the Required Holders) the "Selling Stockholders" and "Plan of Distribution" sections in substantially the form attached hereto as Exhibit B. The Company shall use its best efforts to have each the Registration Statement declared effective by the SEC as soon as practicable, but in no event later than the Effectiveness Deadline. By 9:30 am on the Business Day following the Effective Date, the Company shall file with the SEC in accordance with Rule 424 under the 1933 Act the final prospectus to be used in connection with sales pursuant to such Registration Statement.

b. Allocation of Registrable Securities. The initial number of Registrable Securities included in any Registration Statement and any increase in the number of Registrable Securities included therein shall be allocated pro rata among the Investors based on the number of Registrable Securities held by each Investor at the time the Registration Statement covering such initial number of Registrable Securities or increase thereof is declared effective by the SEC. In the event that an Investor sells or otherwise transfers any of such Investor's Registrable Securities, each transferee shall be allocated a pro rata portion of the then remaining number of Registrable Securities included in such Registration Statement for such transferor. Any shares of Common Stock included in a Registration Statement and which remain allocated to any Person which ceases to hold any Registrable Securities covered by such Registration Statement shall be allocated to the remaining Investors, pro rata based on the number of Registrable Securities then held by such Investors which are covered by such Registration Statement. The Company shall not include any securities other than Registrable Securities and the warrants exercisable into 40,824 shares of Common Stock issued to the Agent (as defined in the Securities Purchase Agreement) on the Closing Date on any Registration Statement without the prior written consent of the Required Holders.

c. Legal Counsel. Subject to Section 5 hereof, the Required Holders shall have the right to select one legal counsel to review and participate in any registration pursuant to this Section 2 ("**Legal Counsel**"), which shall be Schulte Roth & Zabel LLP or such other counsel as thereafter designated by the Required Holders. The Company and Legal Counsel shall reasonably cooperate with each other in performing the Company's obligations under this Agreement.

d. <u>Ineligibility for Form S-3</u>. In the event that Form S-3 is not available for the registration of the resale of Registrable Securities hereunder, the Company shall (i) register the resale of the Registrable Securities on another appropriate form reasonably acceptable to the Required Holders and (ii) undertake to register the Registrable Securities on Form S-3 as soon as such form is available, provided that the Company shall maintain the effectiveness of the Registration Statement then in effect until such time as a Registration Statement on Form S-3 covering the Registrable Securities has been declared effective by the SEC.

e. <u>Sufficient Number of Shares Registered</u>. In the event the number of shares available under a Registration Statement filed pursuant to Section 2(a) is insufficient to cover all of the Registrable Securities required to be covered by such Registration Statement or an Investor's allocated portion of the Registrable Securities pursuant to Section 2(b), the Company shall amend the applicable Registration Statement, or file a new Registration Statement (on the short form available therefor, if applicable), or both, so as to cover at least the Required Registration Amount as of the trading day immediately preceding the date of the filing of such amendment or new Registration Statement, in each case, as soon as practicable, but in any event not later than fifteen (15) days after the necessity therefor arises. The Company shall use its best efforts to cause such amendment and/or new Registration Statement to become effective as soon as practicable following the filing thereof. For purposes of the foregoing provision, the number of shares available under a Registration Statement shall be deemed "insufficient to cover all of the Registrable Securities" if at any time the number of shares of Common Stock available for resale under the Registration Statement is less than the product determined by multiplying (i) the Required Registration Amount as of such time by (ii) 0.90. The calculation set forth in the foregoing sentence shall be made without regard to any limitations on the conversion or redemption of the Notes or the exercise of the Warrants and such calculation shall assume that the Notes are then convertible into shares of Common Stock at the then prevailing Conversion Rate (as defined in the Notes) and that the Warrants are then exercisable for shares of Common Stock at the then prevailing Exercise Price (as defined in the Warrants).

f. <u>Effect of Failure to File and Obtain and Maintain Effectiveness of Registration Statement</u>. If (i) a Registration Statement covering all of the Registrable Securities required to be covered thereby and required to be filed by the Company pursuant to this Agreement is (A) not filed with the SEC on or before the Filing Deadline (a "**Filing Failure**") or (B) but not declared effective by the SEC on or before the respective Effectiveness Deadline (an "**Effectiveness Failure**") or (ii) on any day after the Effective Date sales of all of the Registrable Securities required to be included on such Registration Statement cannot be made for any reason (other than during an Allowable Grace Period (as defined in Section 3(r)) pursuant to such Registration Statement (including, without limitation, because of a failure to keep such Registration Statement effective, to disclose such information as is necessary for sales to be made pursuant to such Registration Statement or to register, subject to the grace periods set forth in Section 2(e) a sufficient number of shares of Common Stock to enable resale of 100% of the shares of Common Stock issuable upon conversion of the Notes and exercise of the Warrants without regard to limitations on conversion, redemption and exercise of such Notes and Warrants and assuming such conversion, redemption or exercise occurred on the date of the filing of the Registration Statement or a suspension or delisting of the Common Stock on its principal trading

exchange or market) (a "**Maintenance Failure**") then, as partial relief for the damages to any holder by reason of any such delay in or reduction of its ability to sell the underlying shares of Common Stock (which remedy shall not be exclusive of any other remedies available at law or in equity), the Company shall pay to each holder of Registrable Securities relating to such Registration Statement an amount in cash equal to one percent (1.0%) of the aggregate Purchase Price (as such term is defined in the Securities Purchase Agreement) of such Investor's Registrable Securities included in such Registration Statement on each of the following dates: (i) the day of a Filing Failure and on every thirtieth day (pro rated for periods totaling less than thirty days) after a Filing Failure until such Filing Failure is cured; (ii) the day of an Effectiveness Failure and on every thirtieth day (pro rated for periods totaling less than thirty days) after an Effectiveness Failure until such Effectiveness Failure is cured; and (iii) the initial day of a Maintenance Failure and on every thirtieth day (pro rated for periods totaling less than thirty days) after a Maintenance Failure until such Maintenance Failure is cured; <u>provided</u>, <u>however</u>, that in no event shall the Company be liable for more than one percent (1%) of penalties during any thirty day period or for multiple events during any thirty day period. The payments to which a holder shall be entitled pursuant to this Section 2(f) are referred to herein as "**Registration Delay Payments**." Registration Delay Payments shall be paid on the day of the Filing Failure, Effectiveness Failure and the initial day of a Maintenance Failure, as applicable, and thereafter on the earlier of (I) the thirtieth day after the event or failure giving rise to the Registration Delay Payments has occurred and (II) the third Business Day after the event or failure giving rise to the Registration Delay Payments is cured. In the event the Company fails to make Registration Delay Payments in a timely manner, such Registration Delay Payments shall bear interest at the rate of one percent (1.0%) per month (prorated for partial months) until paid in full. The parties agree that the Company will not be liable for Registration Delay Payments under this Section in respect of the Warrants.

3. <u>Related Obligations</u>.

At such time as the Company is obligated to file a Registration Statement with the SEC pursuant to Section 2(a), 2(d) or 2(e), the Company will use its best efforts to effect the registration of the Registrable Securities in accordance with the intended method of disposition thereof and, pursuant thereto, the Company shall have the following obligations:

a. The Company shall submit to the SEC, within two (2) Business Days after the Company learns that no review of a particular Registration Statement will be made by the staff of the SEC or that the staff has no further comments on a particular Registration Statement, as the case may be, a request for acceleration of effectiveness of such Registration Statement to a time and date not later than 48 hours after the submission of such request. Subject to Allowable Grace Periods, the Company shall keep each Registration Statement effective pursuant to Rule 415 at all times until the earlier of (i) the date as of which the Investors may sell all of the Registrable Securities covered by such Registration Statement pursuant to Rule 144(k) (or any successor thereto) promulgated under the 1933 Act or (ii) the date on which the Investors shall have sold all of the Registrable Securities covered by such Registration Statement (the "**Registration Period**"). The Company shall ensure that each Registration Statement (including any amendments or supplements thereto and prospectuses contained therein) shall not contain any untrue statement of a material fact or omit to state a material fact required to be stated

therein, or necessary to make the statements therein (in the case of prospectuses, in the light of the circumstances in which they were made) not misleading.

b. The Company shall prepare and file with the SEC such amendments (including post-effective amendments) and supplements to a Registration Statement and the prospectus used in connection with such Registration Statement, which prospectus is to be filed pursuant to Rule 424 promulgated under the 1933 Act, as may be necessary to keep such Registration Statement effective at all times during the Registration Period, and, during such period, comply with the provisions of the 1933 Act with respect to the disposition of all Registrable Securities of the Company covered by such Registration Statement until such time as all of such Registrable Securities shall have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof as set forth in such Registration Statement. In the case of amendments and supplements to a Registration Statement which are required to be filed pursuant to this Agreement (including pursuant to this Section 3(b)) by reason of the Company filing a report on Form 10-Q, Form 10-K or any analogous report under the Securities Exchange Act of 1934, as amended (the "**1934 Act**"), the Company shall have incorporated such report by reference into such Registration Statement, if applicable, or shall file such amendments or supplements with the SEC on the same day on which the 1934 Act report is filed which created the requirement for the Company to amend or supplement such Registration Statement.

c. The Company shall (A) permit Legal Counsel to review and comment upon (i) a Registration Statement at least three (3) Business Days prior to its filing with the SEC and (ii) all amendments and supplements to all Registration Statements (except for any periodic reports under the 1934 Act) within a reasonable number of days prior to their filing with the SEC, and (B) not file any Registration Statement or amendment or supplement thereto in a form to which Legal Counsel reasonably objects; provided, however, that no liquidated damages under Section 2 shall be due to any Investor if Legal Counsel shall have unreasonably objected to the filing or effectiveness of any Registration Statements such as to delay its filing or effectiveness. The Company shall not submit a request for acceleration of the effectiveness of a Registration Statement or any amendment or supplement thereto without the prior approval of Legal Counsel, which consent shall not be unreasonably withheld. The Company shall furnish to Legal Counsel, without charge, (i) copies of any correspondence from the SEC or the staff of the SEC to the Company or its representatives relating to any Registration Statement, (ii) promptly after the same is prepared and filed with the SEC, one copy of any Registration Statement and any amendment(s) thereto, including financial statements and schedules, all documents incorporated therein by reference, if requested by an Investor (if not available pursuant to Rule 424(b)), and all exhibits. The Company shall reasonably cooperate with Legal Counsel in performing the Company's obligations pursuant to this Section 3.

d. The Company shall furnish to each Investor whose Registrable Securities are included in any Registration Statement, without charge, (i) if the Company shall not have filed a final prospectus in accordance with Rule 424 per Section 2(a), upon the effectiveness of any Registration Statement, ten (10) copies of the prospectus included in such Registration Statement and all amendments and supplements thereto (or such other number of copies as such Investor may reasonably request) and (ii) such other documents, including copies of any preliminary or final prospectus, as such Investor may reasonably request from time to time in order to facilitate the disposition of the Registrable Securities owned by such Investor.

e.   The Company shall use its best efforts to (i) register and qualify, unless an exemption from registration and qualification applies, the resale by Investors of the Registrable Securities covered by a Registration Statement under such other securities or "blue sky" laws of all applicable jurisdictions in the United States, (ii) prepare and file in those jurisdictions, such amendments (including post-effective amendments) and supplements to such registrations and qualifications as may be necessary to maintain the effectiveness thereof during the Registration Period, (iii) take such other actions as may be necessary to maintain such registrations and qualifications in effect at all times during the Registration Period, and (iv) take all other actions reasonably necessary or advisable to qualify the Registrable Securities for sale in such jurisdictions; provided, however, that the Company shall not be required in connection therewith or as a condition thereto to (x) qualify to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(e), (y) subject itself to general taxation in any such jurisdiction, or (z) file a general consent to service of process in any such jurisdiction.  The Company shall promptly notify Legal Counsel and each Investor who holds Registrable Securities of the receipt by the Company of any notification with respect to the suspension of the registration or qualification of any of the Registrable Securities for sale under the securities or "blue sky" laws of any jurisdiction in the United States or its receipt of notice of the initiation or threatening of any proceeding for such purpose.

f.   The Company shall notify Legal Counsel and each Investor in writing of the happening of any event, as promptly as practicable after becoming aware of such event, as a result of which the prospectus included in a Registration Statement, as then in effect, includes an untrue statement of a material fact or omission to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (provided that in no event shall such notice contain any material, nonpublic information), and, subject to Section 3(p), promptly prepare a supplement or amendment to such Registration Statement to correct such untrue statement or omission.  The Company shall also promptly notify Legal Counsel and each Investor in writing (i) when a prospectus or any prospectus supplement or post-effective amendment has been filed, and when a Registration Statement or any post-effective amendment has become effective (notification of such effectiveness shall be delivered to Legal Counsel and each Investor by facsimile on the same day of such effectiveness and by overnight mail) and (ii) of the Company's reasonable determination that a post-effective amendment to a Registration Statement would be appropriate.

g.   The Company shall use its best efforts to prevent the issuance of any stop order or other suspension of effectiveness of a Registration Statement, or the suspension of the qualification of any of the Registrable Securities for sale in any jurisdiction and, if such an order or suspension is issued, to obtain the withdrawal of such order or suspension at the earliest possible moment and to notify Legal Counsel and each Investor who holds Registrable Securities being sold of the issuance of such order and the resolution thereof or its receipt of actual notice of the initiation or threat of any proceeding for such purpose.

h.   To the extent any Investor is deemed, alleged or reasonably believes may be alleged, to be an underwriter, at the reasonable request of any Investor, the Company shall furnish to such Investor, on the date of the effectiveness of the Registration Statement and thereafter from time to time on such dates as an Investor may reasonably request (i) a letter, dated such date, from the Company's independent certified public accountants in form and

substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the Investors, and (ii) an opinion, dated as of such date, of counsel representing the Company for purposes of such Registration Statement, in form, scope and substance as is customarily given in an underwritten public offering, addressed to the Investors.

     i.  To the extent any Investor is deemed, alleged or reasonably believes may be alleged, to be an underwriter, the Company shall make available for inspection by (i) any Investor, (ii) Legal Counsel and (iii) one firm of accountants or other agents retained by the Investors (collectively, the "**Inspectors**"), all pertinent financial and other records, and pertinent corporate documents and properties of the Company (collectively, the "**Records**"), as shall be reasonably deemed necessary by each Inspector, and cause the Company's officers, directors and employees to supply all information which any Inspector may reasonably request; provided, however, that each Inspector shall agree to hold in strict confidence and shall not make any disclosure (except to an Investor) or use of any Record or other information which the Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, unless (a) the disclosure of such Records is necessary to avoid or correct a misstatement or omission in any Registration Statement or is otherwise required under the 1933 Act, (b) the release of such Records is ordered pursuant to a final, non-appealable subpoena or order from a court or government body of competent jurisdiction, or (c) the information in such Records has been made generally available to the public other than by disclosure in violation of this or any other Transaction Document. Each Investor agrees that it shall, upon learning that disclosure of such Records is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt notice to the Company and allow the Company, at its expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, the Records deemed confidential. Nothing herein (or in any other confidentiality agreement between the Company and any Investor) shall be deemed to limit the Investors' ability to sell Registrable Securities in a manner which is otherwise consistent with applicable laws and regulations.

     j.  The Company shall hold in confidence and not make any disclosure of information concerning an Investor provided to the Company unless (i) disclosure of such information is necessary or advisable to comply with federal or state securities laws, (ii) the disclosure of such information is necessary or advisable to avoid or correct a misstatement or omission in any Registration Statement, (iii) the release of such information is ordered pursuant to a subpoena or other order from a court or governmental body of competent jurisdiction, or (iv) such information has been made generally available to the public other than by disclosure in violation of this Agreement or any other agreement (provided that in the case of clauses (i) and (ii) such Investor shall be consulted by the Company in connection with any such release or other disclosure prior to its release). The Company agrees that it shall, upon learning that disclosure of such information concerning an Investor is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt written notice to such Investor and allow such Investor, at the Investor's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information.

     k.  The Company shall use its best efforts either to (i) cause all of the Registrable Securities covered by a Registration Statement to be listed on each securities exchange on which securities of the same class or series issued by the Company are then listed, if

any, if the listing of such Registrable Securities is then permitted under the rules of such exchange, or (ii) secure designation and quotation of all of the Registrable Securities covered by a Registration Statement on the Nasdaq National Market or (iii) if, despite the Company's best efforts to satisfy the preceding clauses (i) and (ii), the Company is unsuccessful in satisfying the preceding clauses (i) or (ii), to secure the inclusion for quotation on The Nasdaq Capital Market or the NASD's OTC Bulletin Board for such Registrable Securities and, without limiting the generality of the foregoing, to use its best efforts to arrange for at least two market makers to register with the National Association of Securities Dealers, Inc. ("**NASD**") as such with respect to such Registrable Securities. The Company shall pay all fees and expenses in connection with satisfying its obligation under this Section 3(i).

l. The Company shall cooperate with the Investors who hold Registrable Securities being offered and, to the extent applicable, facilitate the timely preparation and delivery of certificates (not bearing any restrictive legend) representing the Registrable Securities to be offered and resold pursuant to a Registration Statement and enable such certificates to be in such denominations or amounts, as the case may be, as the Investors may reasonably request and registered in such names as the Investors may request.

m. If requested by an Investor, the Company shall (i) as soon as practicable incorporate in a prospectus supplement or post-effective amendment such information as an Investor reasonably requests to be included therein relating to the sale and distribution of Registrable Securities, including, without limitation, information with respect to the number of Registrable Securities being offered or sold, the purchase price being paid therefor and any other terms of the offering of the Registrable Securities to be sold in such offering; (ii) as soon as practicable make all required filings of such prospectus supplement or post-effective amendment after being notified of the matters to be incorporated in such prospectus supplement or post-effective amendment; and (iii) as soon as practicable, supplement or make amendments to any Registration Statement if reasonably requested by an Investor holding any Registrable Securities.

n. The Company shall use its best efforts to cause the Registrable Securities covered by a Registration Statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to consummate the disposition of such Registrable Securities.

o. The Company shall otherwise use its best efforts to comply with all applicable rules and regulations of the SEC in connection with any registration hereunder.

p. Within two (2) Business Days after a Registration Statement which covers Registrable Securities is declared effective by the SEC, the Company shall deliver, and shall cause legal counsel for the Company to deliver, to the transfer agent for such Registrable Securities (with copies to the Investors whose Registrable Securities are included in such Registration Statement) confirmation that such Registration Statement has been declared effective by the SEC in the form attached hereto as Exhibit A.

q. Notwithstanding anything to the contrary herein, at any time after the Effective Date, the Company may delay the disclosure of material, non-public information

concerning the Company the disclosure of which at the time is not, in the good faith opinion of the Board of Directors of the Company (following consultation with its counsel), in the best interest of the Company (a "**Grace Period**"); provided, that the Company shall promptly (i) notify the Investors in writing that such determination has been made (provided that in each notice the Company will not disclose the content of such material, non-public information to the Investors) and the date on which the Grace Period will begin, and (ii) notify the Investors in writing of the date on which the Grace Period ends; and, provided further, that during any three hundred sixty five (365) day period such Grace Periods shall not exceed an aggregate of twenty (20) days and the first day of any Grace Period must be at least two (2) trading days after the last day of any prior Grace Period (each, an "**Allowable Grace Period**"). For purposes of determining the length of a Grace Period above, the Grace Period shall begin on and include the date the Investors receive the notice referred to in clause (i) and shall end on and include the later of the date the Investors receive the notice referred to in clause (ii) and the date referred to in such notice. The provisions of Section 3(g) hereof shall not be applicable during the period of any Allowable Grace Period. Upon expiration of the Grace Period, the Company shall again be bound by the first sentence of Section 3(f) with respect to the information giving rise thereto unless such material, non-public information is no longer applicable. Notwithstanding anything to the contrary, the Company shall cause its transfer agent to deliver unlegended shares of Common Stock to a transferee of an Investor in accordance with the terms of the Securities Purchase Agreement in connection with any sale of Registrable Securities with respect to which an Investor has entered into a contract for sale, and delivered a copy of the prospectus included as part of the applicable Registration Statement (unless an exemption from such prospectus delivery requirement exists), prior to the Investor's receipt of the notice of a Grace Period and for which the Investor has not yet settled.

4.  Obligations of the Investors.

a.  At least five (5) Business Days prior to the first anticipated filing date of a Registration Statement, the Company shall notify each Investor in writing of the information the Company requires from each such Investor if such Investor elects to have any of such Investor's Registrable Securities included in such Registration Statement. It shall be a condition precedent to the obligations of the Company to complete the registration pursuant to this Agreement, and any time deadlines for the Company hereunder shall be extended for the number of days an Investor does not comply with this Section 4, with respect to the Registrable Securities of a particular Investor that such Investor shall furnish to the Company a "Selling Stockholder Questionnaire", in the form attached hereto as Exhibit C, and such other information regarding itself, the Registrable Securities held by it and the intended method of disposition of the Registrable Securities held by it as shall be reasonably required to effect the effectiveness of the registration of such Registrable Securities and shall execute such documents in connection with such registration as the Company may reasonably request.

b.  Each Investor, by such Investor's acceptance of the Registrable Securities, agrees to cooperate with the Company as reasonably requested by the Company in connection with the preparation and filing of any Registration Statement hereunder, unless such Investor has notified the Company in writing of such Investor's election to exclude all of such Investor's Registrable Securities from such Registration Statement.

10074678.5